**PEPSICO, INC., a corporation,
Plaintiff–Appellee,**

v.

**William E. REDMOND, Jr., and The Quaker Oats Company, a corporation, Defendants–Appellants.**

**No. 94–3942.**

United States Court of Appeals,
Seventh Circuit.

Argued April 6, 1995.

Decided May 11, 1995.*

---

* This opinion was originally released in typescript.

Roger Pascal (argued), Joseph A. Cancila, Jr., James A. Clark, Stuart I. Graff, Schiff, Hardin & Waite, Chicago, IL, for PepsiCo, Inc., a corporation, for Plaintiff–Appellee.

Bradford P. Lyerla, Debbie L. Moeckler, Jenner & Block, Chicago, IL, for William E. Redmond, Jr.

Helene D. Jaffe, Marc Brotman, Weil, Gotshal & Manges, New York City, P. Kevin Connelly (argued), Michael J. Sheehan, James J. Oh, Connelly, Sheehan & Moran, Chicago, IL, for Quaker Oats Company.

Before BAUER, COFFEY, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Plaintiff PepsiCo, Inc., sought a preliminary injunction against defendants William Redmond and the Quaker Oats Company to prevent Redmond, a former PepsiCo employee, from divulging PepsiCo trade secrets and confidential information in his new job with Quaker and from assuming any duties with Quaker relating to beverage pricing, marketing, and distribution. The district court agreed with PepsiCo and granted the injunction. We now affirm that decision.

## I.

The facts of this case lay against a backdrop of fierce beverage-industry competition

between Quaker and PepsiCo, especially in "sports drinks"[1] and "new age drinks."[2] Quaker's sports drink, "Gatorade," is the dominant brand in its market niche. Pepsi-Co introduced its Gatorade rival, "All Sport," in March and April of 1994, but sales of All Sport lag far behind those of Gatorade. Quaker also has the lead in the new-age-drink category. Although PepsiCo has entered the market through joint ventures with the Thomas J. Lipton Company and Ocean Spray Cranberries, Inc., Quaker purchased Snapple Beverage Corp., a large new-age-drink maker, in late 1994. PepsiCo's products have about half of Snapple's market share. Both companies see 1995 as an important year for their products: PepsiCo has developed extensive plans to increase its market presence, while Quaker is trying to solidify its lead by integrating Gatorade and Snapple distribution. Meanwhile, PepsiCo and Quaker each face strong competition from Coca Cola Co., which has its own sports drink, "PowerAde," and which introduced its own Snapple-rival, "Fruitopia," in 1994, as well as from independent beverage producers.

William Redmond, Jr., worked for PepsiCo in its Pepsi–Cola North America division ("PCNA") from 1984 to 1994. Redmond became the General Manager of the Northern California Business Unit in June, 1993, and was promoted one year later to General Manager of the business unit covering all of California, a unit having annual revenues of more than 500 million dollars and representing twenty percent of PCNA's profit for all of the United States.

Redmond's relatively high-level position at PCNA gave him access to inside information and trade secrets. Redmond, like other PepsiCo management employees, had signed a confidentiality agreement with PepsiCo. That agreement stated in relevant part that he

w[ould] not disclose at any time, to anyone other than officers or employees of [Pepsi-Co], or make use of, confidential information relating to the business of [PepsiCo] ... obtained while in the employ of [Pepsi-Co], which shall not be generally known or available to the public or recognized as standard practices.

Donald Uzzi, who had left PepsiCo in the beginning of 1994 to become the head of Quaker's Gatorade division, began courting Redmond for Quaker in May, 1994. Redmond met in Chicago with Quaker officers in August, 1994, and on October 20, 1994, Quaker, through Uzzi, offered Redmond the position of Vice President—On Premise Sales for Gatorade. Redmond did not then accept the offer but continued to negotiate for more money. Throughout this time, Redmond kept his dealings with Quaker secret from his employers at PCNA.

On November 8, 1994, Uzzi extended Redmond a written offer for the position of Vice President–Field Operations for Gatorade and Redmond accepted. Later that same day, Redmond called William Bensyl, the Senior Vice President of Human Resources for PCNA, and told him that he had an offer from Quaker to become the Chief Operating Officer of the combined Gatorade and Snapple company but had not yet accepted it. Redmond also asked whether he should, in light of the offer, carry out his plans to make calls upon certain PCNA customers. Bensyl told Redmond to make the visits.

Redmond also misstated his situation to a number of his PCNA colleagues, including Craig Weatherup, PCNA's President and Chief Executive Officer, and Brenda Barnes, PCNA's Chief Operating Officer and Redmond's immediate superior. As with Bensyl, Redmond told them that he had been offered the position of Chief Operating Officer at Gatorade and that he was leaning "60/40" in favor of accepting the new position.

On November 10, 1994, Redmond met with Barnes and told her that he had decided to accept the Quaker offer and was resigning from PCNA. Barnes immediately took Red-

---

**1.** Sports drinks are also called "isotonics," implying that they contain the same salt concentration as human blood, and "electrolytes," implying that the substances contained in the drink have dissociated into ions.

**2.** "New age drink" is a catch-all category for non-carbonated soft drinks and includes such beverages as ready-to-drink tea products and fruit drinks. Sports drinks may also fall under the new-age-drink heading.

mond to Bensyl, who told Redmond that PepsiCo was considering legal action against him.

True to its word, PepsiCo filed this diversity suit on November 16, 1994, seeking a temporary restraining order to enjoin Redmond from assuming his duties at Quaker and to prevent him from disclosing trade secrets or confidential information to his new employer. The district court granted PepsiCo's request that same day but dissolved the order *sua sponte* two days later, after determining that PepsiCo had failed to meet its burden of establishing that it would suffer irreparable harm. The court found that PepsiCo's fears about Redmond were based upon a mistaken understanding of his new position at Quaker and that the likelihood that Redmond would improperly reveal any confidential information did not "rise above mere speculation."

From November 23, 1994, to December 1, 1994, the district court conducted a preliminary injunction hearing on the same matter. At the hearing, PepsiCo offered evidence of a number of trade secrets and confidential information it desired protected and to which Redmond was privy. First, it identified PCNA's "Strategic Plan," an annually revised document that contains PCNA's plans to compete, its financial goals, and its strategies for manufacturing, production, marketing, packaging, and distribution for the coming three years. Strategic Plans are developed by Weatherup and his staff with input from PCNA's general managers, including Redmond, and are considered highly confidential. The Strategic Plan derives much of its value from the fact that it is secret and competitors cannot anticipate PCNA's next moves. PCNA managers received the most recent Strategic Plan at a meeting in July, 1994, a meeting Redmond attended. PCNA also presented information at the meeting regarding its plans for Lipton ready-to-drink teas and for All Sport for 1995 and beyond, including new flavors and package sizes.

Second, PepsiCo pointed to PCNA's Annual Operating Plan ("AOP") as a trade secret. The AOP is a national plan for a given year and guides PCNA's financial goals, marketing plans, promotional event calendars, growth expectations, and operational changes in that year. The AOP, which is implemented by PCNA unit General Managers, including Redmond, contains specific information regarding all PCNA initiatives for the forthcoming year. The AOP bears a label that reads "Private and Confidential—Do Not Reproduce" and is considered highly confidential by PCNA managers.

In particular, the AOP contains important and sensitive information about "pricing architecture"—how PCNA prices its products in the marketplace. Pricing architecture covers both a national pricing approach and specific price points for given areas. Pricing architecture also encompasses PCNA's objectives for All Sport and its new age drinks with reference to trade channels, package sizes and other characteristics of both the products and the customers at which the products are aimed. Additionally, PCNA's pricing architecture outlines PCNA's customer development agreements. These agreements between PCNA and retailers provide for the retailer's participation in certain merchandising activities for PCNA products. As with other information contained in the AOP, pricing architecture is highly confidential and would be extremely valuable to a competitor. Knowing PCNA's pricing architecture would allow a competitor to anticipate PCNA's pricing moves and underbid PCNA strategically whenever and wherever the competitor so desired. PepsiCo introduced evidence that Redmond had detailed knowledge of PCNA's pricing architecture and that he was aware of and had been involved in preparing PCNA's customer development agreements with PCNA's California and California-based national customers. Indeed, PepsiCo showed that Redmond, as the General Manager for California, would have been responsible for implementing the pricing architecture guidelines for his business unit.

PepsiCo also showed that Redmond had intimate knowledge of PCNA "attack plans" for specific markets. Pursuant to these plans, PCNA dedicates extra funds to supporting its brands against other brands in selected markets. To use a hypothetical example, PCNA might budget an additional $500,000 to spend in Chicago at a particular

time to help All Sport close its market gap with Gatorade. Testimony and documents demonstrated Redmond's awareness of these plans and his participation in drafting some of them.

Finally, PepsiCo offered evidence of PCNA trade secrets regarding innovations in its selling and delivery systems. Under this plan, PCNA is testing a new delivery system that could give PCNA an advantage over its competitors in negotiations with retailers over shelf space and merchandising. Redmond has knowledge of this secret because PCNA, which has invested over a million dollars in developing the system during the past two years, is testing the pilot program in California.

Having shown Redmond's intimate knowledge of PCNA's plans for 1995, PepsiCo argued that Redmond would inevitably disclose that information to Quaker in his new position, at which he would have substantial input as to Gatorade and Snapple pricing, costs, margins, distribution systems, products, packaging and marketing, and could give Quaker an unfair advantage in its upcoming skirmishes with PepsiCo. Redmond and Quaker countered that Redmond's primary initial duties at Quaker as Vice President—Field Operations would be to integrate Gatorade and Snapple distribution and then to manage that distribution as well as the promotion, marketing and sales of these products. Redmond asserted that the integration would be conducted according to a pre-existing plan and that his special knowledge of PCNA strategies would be irrelevant. This irrelevance would derive not only from the fact that Redmond would be implementing pre-existing plans but also from the fact that PCNA and Quaker distribute their products in entirely different ways: PCNA's distribution system is vertically integrated (i.e., PCNA owns the system) and delivers its product directly to retailers, while Quaker ships its product to wholesalers and customer warehouses and relies on independent distributors. The defendants also pointed out that Redmond had signed a confidentiality agreement with Quaker preventing him from disclosing "any confidential information belonging to others," as well as the Quaker Code of Ethics, which prohibits employees from engaging in "illegal or improper acts to acquire a competitor's trade secrets." Redmond additionally promised at the hearing that should he be faced with a situation at Quaker that might involve the use or disclosure of PCNA information, he would seek advice from Quaker's in-house counsel and would refrain from making the decision.

PepsiCo responded to the defendants' representations by pointing out that the evidence did not show that Redmond would simply be implementing a business plan already in place. On the contrary, as of November, 1994, the plan to integrate Gatorade and Snapple distribution consisted of a single distributorship agreement and a two-page "contract terms summary." Such a basic plan would not lend itself to widespread application among the over 300 independent Snapple distributors. Since the integration process would likely face resistance from Snapple distributors and Quaker had no scheme to deal with this probability, Redmond, as the person in charge of the integration, would likely have a great deal of influence on the process. PepsiCo further argued that Snapple's 1995 marketing and promotion plans had not necessarily been completed prior to Redmond's joining Quaker, that Uzzi disagreed with portions of the Snapple plans, and that the plans were open to re-evaluation. Uzzi testified that the plan for integrating Gatorade and Snapple distribution is something that would happen in the future. Redmond would therefore likely have input in remaking these plans, and if he did, he would inevitably be making decisions with PCNA's strategic plans and 1995 AOP in mind. Moreover, PepsiCo continued, diverging testimony made it difficult to know exactly what Redmond would be doing at Quaker. Redmond described his job as "managing the entire sales effort of Gatorade at the field level, possibly including strategic planning," and at least at one point considered his job to be equivalent to that of a Chief Operating Officer. Uzzi, on the other hand, characterized Redmond's position as "primarily and initially to restructure and integrate our—the distribution systems for Snapple and for Gatorade, as per our distribution plan" and then to "execute marketing,

promotion and sales plans in the marketplace." Uzzi also denied having given Redmond detailed information about any business plans, while Redmond described such a plan in depth in an affidavit and said that he received the information from Uzzi. Thus, PepsiCo asserted, Redmond would have a high position in the Gatorade hierarchy, and PCNA trade secrets and confidential information would necessarily influence his decisions. Even if Redmond could somehow refrain from relying on this information, as he promised he would, his actions in leaving PCNA, Uzzi's actions in hiring Redmond, and the varying testimony regarding Redmond's new responsibilities, made Redmond's assurances to PepsiCo less than comforting.

On December 15, 1994, the district court issued an order enjoining Redmond from assuming his position at Quaker through May, 1995, and permanently from using or disclosing any PCNA trade secrets or confidential information. The court entered its findings of fact and conclusions of law on January 26, 1995, *nunc pro tunc* December 15, 1994. The court, which completely adopted PepsiCo's position, found that Redmond's new job posed a clear threat of misappropriation of trade secrets and confidential information that could be enjoined under Illinois statutory and common law. The court also emphasized Redmond's lack of forthrightness both in his activities before accepting his job with

Quaker and in his testimony as factors leading the court to believe the threat of misappropriation was real. This appeal followed.

## II.

■ Both parties agree that the primary issue on appeal is whether the district court correctly concluded that PepsiCo had a reasonable likelihood of success on its various claims for trade secret misappropriation and breach of a confidentiality agreement.[3] We review the district court's legal conclusions in issuing a preliminary injunction *de novo* and its factual determinations and balancing of the equities for abuse of discretion. *SEC v. Cherif*, 933 F.2d 403, 408 (7th Cir.1991), *cert. denied*, 502 U.S. 1071, 112 S.Ct. 966, 117 L.Ed.2d 131 (1992); *Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1014 (7th Cir.1990).[4]

### A.

■ The Illinois Trade Secrets Act ("ITSA"), which governs the trade secret issues in this case, provides that a court may enjoin the "actual or threatened misappropriation" of a trade secret. 765 ILCS 1065/3(a); *George S. May Int'l Co. v. Int'l Profit Associates*, 256 Ill.App.3d 779, 195 Ill.Dec. 183, 189, 628 N.E.2d 647, 653 (1st Dist.1993), *appeal denied*, 156 Ill.2d 557, 202 Ill.Dec. 921, 638 N.E.2d 1115 (1994); *see also* 2 Melvin F. Jager, *Trade Secrets Law* § IL.01[7] at IL–7

3. The district court concluded that PepsiCo satisfied the other requirements for a preliminary injunction: whether PepsiCo has an adequate remedy at law or will be irreparably harmed if the injunction does not issue; whether the threatened injury to PepsiCo outweighs the threatened harm the injunction may inflict on Quaker and Redmond; and whether the granting of the preliminary injunction will disserve the public interest. *See Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1137 (7th Cir.1994); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir.1992). Quaker and Redmond do not challenge these holdings on appeal.

4. In the instant case, the district court adopted PepsiCo's proposed findings of fact and conclusions of law verbatim as the text for most of its opinion. As we have stated before, it is acceptable for a district court laboring under the time pressures of a preliminary injunction in addition to its already busy docket to adopt "many or

most of the parties' proposed findings of fact and conclusions of law, particularly if skillfully and wisely drafted." *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 23 (7th Cir.1992); *see also Andre v. Bendix Corp.*, 774 F.2d 786, 800 (7th Cir.1985); *Lektro–Vend Corp. v. Vendo Co.*, 660 F.2d 255, 263 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). That the district court so acts does not alter our basic standard of review. *Andre*, 774 F.2d at 800. This action does, however, cause us some pause where, as here, the court changed nothing in a party's submissions and even repeated that party's typographical errors. *See Abbott Laboratories*, 971 F.2d at 23 ("[D]istrict judges, ... when presented with proposed findings and conclusions that hug the extremes, [should] consider developing alternatives of their own."). Our review of the district court's opinion remains deferential but, in these circumstances, requires a closer and harder look.

to 8 (Clark Boardman Callaghan, rev. ed. 1994). A party seeking an injunction must therefore prove both the existence of a trade secret and the misappropriation. The defendants' appeal focuses solely on misappropriation; although the defendants only reluctantly refer to PepsiCo's marketing and distribution plans as trade secrets, they do not seriously contest that this information falls under the ITSA.[5]

The question of threatened or inevitable misappropriation in this case lies at the heart of a basic tension in trade secret law. Trade secret law serves to protect "standards of commercial morality" and "encourage[ ] invention and innovation" while maintaining "the public interest in having free and open competition in the manufacture and sale of unpatented goods." 2 Jager, *supra*, § IL.03 at IL–12. Yet that same law should not prevent workers from pursuing their livelihoods when they leave their current positions. *American Can Co. v. Mansukhani*, 742 F.2d 314, 329 (7th Cir.1984). It has been said that federal age discrimination law does not guarantee tenure for older employees. *Partington v. Broyhill Furniture Industries, Inc.*, 999 F.2d 269, 271 (7th Cir.1993). Similarly, trade secret law does not provide a reserve clause for solicitous employers. *Cf. Flood v. Kuhn*, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972).

This tension is particularly exacerbated when a plaintiff sues to prevent not the actual misappropriation of trade secrets but the mere threat that it will occur. While the ITSA plainly permits a court to enjoin the threat of misappropriation of trade secrets, there is little law in Illinois or in this circuit

establishing what constitutes threatened or inevitable misappropriation.[6] Indeed, there are only two cases in this circuit that address the issue: *Teradyne, Inc. v. Clear Communications Corp.*, 707 F.Supp. 353 (N.D.Ill1989), and *AMP Inc. v. Fleischhacker*, 823 F.2d 1199 (7th Cir.1987).

In *Teradyne*, Teradyne alleged that a competitor, Clear Communications, had lured employees away from Teradyne and intended to employ them in the same field. In an insightful opinion, Judge Zagel observed that "[t]hreatened misappropriation can be enjoined under Illinois law" where there is a "high degree of probability of inevitable and immediate . . . use of . . . trade secrets." *Teradyne*, 707 F.Supp. at 356. Judge Zagel held, however, that Teradyne's complaint failed to state a claim because Teradyne did not allege "that defendants have in fact threatened to use Teradyne's secrets or that they will inevitably do so." Teradyne's claims would have passed Rule 12(b)(6) muster had they properly alleged inevitable disclosure, including a statement that Clear intended to use Teradyne's trade secrets or that the former Teradyne employees had disavowed their confidentiality agreements with Teradyne, or an allegation that Clear could not operate without Teradyne's secrets. However,

> [t]he defendants' claimed acts, working for Teradyne, knowing its business, leaving its business, hiring employees from Teradyne and entering the same field (though in a market not yet serviced by Teradyne) do not state a claim of threatened misappropriation. All that is alleged, at bottom, is that defendants could misuse plaintiff's se-

---

5. Under the ITSA, trade secret "means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers that:

 (1) is sufficiently secret to derive economic value, actual or potential, from not generally being known to other persons who can obtain economic value from its disclosure or use; and
 (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality."

 765 ILCS 1065/2(d). Although pre-ITSA Illinois case law had somewhat muddled the question, the ITSA "was specifically drafted to overcome

any confusion, and return Illinois to its earlier, more stable situation, where important confidential business information is protectable under trade secret law." 2 Jager, *supra*, § IL.05 at IL–14.1.

6. The ITSA definition of misappropriation relevant to this discussion is "the disclosure or use of a trade secret of a person without express or implied consent by another person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy. . . ." 765 ILCS 1065/2(b).

crets, and plaintiffs fear they will. This is not enough. It may be that little more is needed, but falling a little short is still falling short. *Id.* at 357.

In *AMP,* we affirmed the denial of a preliminary injunction on the grounds that the plaintiff AMP had failed to show either the existence of any trade secrets or the likelihood that defendant Fleischhacker, a former AMP employee, would compromise those secrets or any other confidential business information. AMP, which produced electrical and electronic connection devices, argued that Fleishhacker's new position at AMP's competitor would inevitably lead him to compromise AMP's trade secrets regarding the manufacture of connectors. *AMP,* 823 F.2d at 1207. In rejecting that argument, we emphasized that the mere fact that a person assumed a similar position at a competitor does not, without more, make it "inevitable that he will use or disclose ... trade secret information" so as to "demonstrate irreparable injury." *Id.*

■ It should be noted that *AMP,* which we decided in 1987, predates the ITSA, which took effect in 1988. The ITSA abolishes any common law remedies or authority contrary to its own terms. 765 ILCS 1065/8. The ITSA does not, however, represent a major deviation from the Illinois common law of unfair trade practices. *Elmer Miller, Inc. v. Landis,* 253 Ill.App.3d 129, 192 Ill.Dec. 378, 381, 625 N.E.2d 338, 341 (1st Dist.1993), *appeal denied,* 154 Ill.2d 559, 197 Ill.Dec. 485, 631 N.E.2d 707 (1994); *Colson Co. v. Wittel,* 210 Ill.App.3d 1030, 155 Ill.Dec. 471, 473, 569 N.E.2d 1082, 1084 (4th Dist.), *appeal denied,* 141 Ill.2d 537, 162 Ill.Dec. 484, 580 N.E.2d 110 (1991). The ITSA mostly codifies rather than modifies the common law doctrine that preceded it. Thus, we believe that *AMP* continues to reflect the proper standard under Illinois's current statutory scheme.[7]

■ The ITSA, *Teradyne,* and *AMP* lead to the same conclusion: a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets. *See also* 1 Jager, *supra,* § 7.02[2][a] at 7–20 (noting claims where "the allegation is based on the fact that the disclosure of trade secrets in the new employment is inevitable, whether or not the former employee acts consciously or unconsciously"). The defendants are incorrect that Illinois law does not allow a court to enjoin the "inevitable" disclosure of trade secrets. Questions remain, however, as to what constitutes inevitable misappropriation and whether PepsiCo's submissions rise above those of the *Teradyne* and *AMP* plaintiffs and meet that standard. We hold that they do.

■ PepsiCo presented substantial evidence at the preliminary injunction hearing that Redmond possessed extensive and intimate knowledge about PCNA's strategic goals for 1995 in sports drinks and new age drinks. The district court concluded on the basis of that presentation that unless Redmond possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about Gatorade and Snapple by relying on his knowledge of PCNA trade secrets. It is not the "general skills and knowledge acquired during his tenure with" PepsiCo that PepsiCo seeks to keep from falling into Quaker's hands, but rather "the particularized plans or processes developed by [PCNA] and disclosed to him while the employer-employee relationship existed, which are unknown to others in the industry and which give the employer an advantage over his competitors." *AMP,* 823 F.2d at 1202. The *Teradyne* and *AMP* plaintiffs could do nothing more than assert that skilled employees were taking their skills elsewhere; PepsiCo has done much more.

---

**7.** The ITSA has overruled *AMP's* implications regarding the durability of an agreement to protect trade secrets. *AMP* followed a line of Illinois cases questioning the validity of agreements to keep trade secrets confidential where those agreements did not have durational or geographical limits. *AMP,* 823 F.2d at 1202. The ITSA, in reversing those cases, provides that "a contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographical limitation on the duty." 765 ILCS 1065/8(b)(1); *see also* 2 Jager, *supra,* § IL.07 at IL–18 to 19.

Admittedly, PepsiCo has not brought a traditional trade secret case, in which a former employee has knowledge of a special manufacturing process or customer list and can give a competitor an unfair advantage by transferring the technology or customers to that competitor. *See, e.g., Glenayre Electronics, Ltd. v. Sandahl,* 830 F.Supp. 1149 (C.D.Ill.1993) (preliminary injunction sought to prevent use of trade secrets regarding pager technology); *Stampede Tool Warehouse, Inc. v. May,* 1995 WL 121439 (Ill.App. 1st Dist. March 22, 1995) (preliminary injunction sought to prevent use of customer lists); *Colson,* 155 Ill.Dec. at 473, 569 N.E.2d at 1082 (same); *Televation Telecommunication Systems, Inc. v. Saindon,* 169 Ill.App.3d 8, 119 Ill.Dec. 500, 522 N.E.2d 1359 (2d Dist.) (preliminary injunction sought to prevent use of trade secrets regarding analog circuitry in a wake-up call device), *appeal denied,* 122 Ill.2d 595, 125 Ill.Dec. 238, 530 N.E.2d 266 (1988). PepsiCo has not contended that Quaker has stolen the All Sport formula or its list of distributors. Rather PepsiCo has asserted that Redmond cannot help but rely on PCNA trade secrets as he helps plot Gatorade and Snapple's new course, and that these secrets will enable Quaker to achieve a substantial advantage by knowing exactly how PCNA will price, distribute, and market its sports drinks and new age drinks and being able to respond strategically. *Cf. FMC Corp. v. Varco Int'l, Inc.,* 677 F.2d 500, 504 (5th Cir.1982) ("Even assuming the best of good faith, Witt will have difficulty preventing his knowledge of FMC's 'Longsweep' manufacturing techniques from infiltrating his work."). This type of trade secret problem may arise less often, but it nevertheless falls within the realm of trade secret protection under the present circumstances.[8]

Quaker and Redmond assert that they have not and do not intend to use whatever confidential information Redmond has by virtue of his former employment. They point out that Redmond has already signed an agreement with Quaker not to disclose any trade secrets or confidential information gleaned from his earlier employment. They also note with regard to distribution systems that even if Quaker wanted to steal information about PCNA's distribution plans, they would be completely useless in attempting to integrate the Gatorade and Snapple beverage lines.

The defendants' arguments fall somewhat short of the mark. Again, the danger of misappropriation in the present case is not that Quaker threatens to use PCNA's secrets to create distribution systems or co-opt PCNA's advertising and marketing ideas. Rather, PepsiCo believes that Quaker, unfairly armed with knowledge of PCNA's plans, will be able to anticipate its distribution, packaging, pricing, and marketing moves. Redmond and Quaker even concede that Redmond might be faced with a decision that could be influenced by certain confidential information that he obtained while at PepsiCo. In other words, PepsiCo finds itself in the position of a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game. Quaker and Redmond's protestations that their distribution systems and plans are entirely different from PCNA's are thus not really responsive.

The district court also concluded from the evidence that Uzzi's actions in hiring Redmond and Redmond's actions in pursuing and accepting his new job demonstrated a lack of candor on their part and proof of their willingness to misuse PCNA trade secrets, findings Quaker and Redmond vigorously challenge. The court expressly found that:

> Redmond's lack of forthrightness on some occasions, and out and out lies on others, in the period between the time he accepted the position with defendant Quaker and when he informed plaintiff that he had accepted that position leads the court to conclude that defendant Redmond could not be trusted to act with the necessary sensitivity and good faith under the circumstances in which the only practical verification that he was not using plaintiff's secrets would be defendant Redmond's word to that effect.

---

**8.** PepsiCo does contend that Quaker may well misappropriate its new, trade-secret distribution system because Snapple has a similar system and Quaker is not familiar with it. This argument approaches the sort of speculation we rejected in *AMP* and Judge Zagel rejected in *Teradyne.* We need not pass on its validity, however, because it is not central to PepsiCo's case.

The facts of the case do not ineluctably dictate the district court's conclusion. Redmond's ambiguous behavior toward his PepsiCo superiors might have been nothing more than an attempt to gain leverage in employment negotiations. The discrepancy between Redmond's and Uzzi's comprehension of what Redmond's job would entail may well have been a simple misunderstanding. The court also pointed out that Quaker, through Uzzi, seemed to express an unnatural interest in hiring PCNA employees: all three of the people interviewed for the position Redmond ultimately accepted worked at PCNA. Uzzi may well have focused on recruiting PCNA employees because he knew they were good and not because of their confidential knowledge. Nonetheless, the district court, after listening to the witnesses, determined otherwise. That conclusion was not an abuse of discretion.[9]

That conclusion also renders inapposite the defendants' reliance on *Cincinnati Tool Steel Co. v. Breed,* 136 Ill.App.3d 267, 90 Ill.Dec. 463, 482 N.E.2d 170 (2d Dist.1985). In *Cincinnati Tool,* the court held that the defendant's "express denial that she had disclosed or would disclose any confidential information or that she even possessed such information" left the plaintiff without a case, one that could not be saved "merely by offering evidence that defendant used customer and price data in her work while employed by plaintiff." 482 N.E.2d at 180; *see also Smith Oil Corp. v. Viking Chemical Co.,* 127 Ill. App.3d 423, 82 Ill.Dec. 250, 256, 468 N.E.2d 797, 803 (2d Dist.1984) (injunction inappropriately granted for lack of evidence that defendants had taken materials relating to plaintiff's trade secrets or had accepted or threatened to accept an offer or solicit a bid from plaintiff's customers prior to leaving plaintiff's employ). In the instant case, the district court simply did not believe the denials and had reason to do so.

Thus, when we couple the demonstrated inevitability that Redmond would rely on PCNA trade secrets in his new job at Quaker with the district court's reluctance to believe that Redmond would refrain from disclosing these secrets in his new position (or that

Quaker would ensure Redmond did not disclose them), we conclude that the district court correctly decided that PepsiCo demonstrated a likelihood of success on its statutory claim of trade secret misappropriation.

**B.**

Although it does not affect our decision to uphold the preliminary injunction, we disagree with the district court's conclusion that PepsiCo is likely to prevail on its claim of trade secret misappropriation under Illinois common law. As noted earlier, the ITSA abolished common law causes of action for misappropriation of trade secrets. 765 ILCS 1065/8(a); *Composite Marine Propellers v. Van Der Woude,* 962 F.2d 1263, 1265 (7th Cir.1992) (*per curiam*); *see also Micro Display Systems, Inc. v. Axtel, Inc.,* 699 F.Supp. 202, 204–05 (D.Minn.1988) (holding same for Minnesota Uniform Trade Secrets Act). PepsiCo's claim here has no merit; it cannot prevail on a claim that does not exist. PepsiCo's silence on the issue in its appellate brief indicates that it concedes the point.

**C.**

For the same reasons we concluded that the district court did not abuse its discretion in granting the preliminary injunction on the issue of trade secret misappropriation, we also agree with its decision on the likelihood of Redmond's breach of his confidentiality agreement should he begin working at Quaker. Because Redmond's position at Quaker would initially cause him to disclose trade secrets, it would necessarily force him to breach his agreement not to disclose confidential information acquired while employed in PCNA. *Cf. George S. May Int'l,* 195 Ill.Dec. at 189, 628 N.E.2d at 653 ("An employer's trade secrets are considered a protectable interest for a restrictive covenant under Illinois law.").

Quaker and Remond do not assert that the confidentiality agreement is invalid; such agreements are enforceable when supported by adequate consideration. *See, e.g,*

9. These findings, which were not submitted by PepsiCo, represent the district court's one major deviation from its decision to embrace in whole PepsiCo's proposed conclusions. That the dis-

trict court reached this conclusion independently strongly bolsters our confidence in its decision and our willingness to defer to it.

*Corroon & Black of Illinois, Inc. v. Magner,* 145 Ill.App.3d 151, 98 Ill.Dec. 663, 669, 494 N.E.2d 785, 791 (1st Dist.1986).[10] Rather, they argue that "inevitable" breaches of these contracts may not be enjoined. The case on which they rely, however, *R.R. Donnelley & Sons Co. v. Fagan,* 767 F.Supp. 1259 (S.D.N.Y.1991) (applying Illinois law), says nothing of the sort. The *R.R. Donnelley* court merely found that the plaintiffs had failed to prove the existence of any confidential information or any indication that the defendant would ever use it. *Id.* at 1267. The threat of misappropriation that drives our holding with regard to trade secrets dictates the same result here.

### III.

■■■■■ Finally, Redmond and Quaker have contended in the alternative that the injunction issued against them is overbroad. They disagree in particular with the injunction's prohibition against Redmond's participation in the integration of the Snapple and Gatorade distribution systems. The defendants claim that whatever trade secret and confidential information Redmond has, that information is completely irrelevant to Quaker's integration task. They further argue that, because Redmond would only be implementing a plan already in place, the injunction is especially inappropriate. A district court ordinarily has wide latitude in fashioning injunctive relief, and we will restrict the breadth of an injunction only where the district court has abused its discretion. *Preston v. Thompson,* 589 F.2d 300, 303 (7th Cir. 1978). Nonetheless, a court abuses its discretion where the scope of injunctive relief "exceed[s] the extent of the plaintiff's protectible rights." *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1094 (7th Cir.1988).

While the defendants' arguments are not without some merit, the district court determined that the proposed integration would require Redmond to do more than execute a plan someone else had drafted. It also found

that Redmond's knowledge of PCNA's trade secrets and confidential information would inevitably shape that integration and that Redmond could not be trusted to avoid that conflict of interest. If the injunction permanently enjoined Redmond from assuming these duties at Quaker, the defendants' argument would be stronger. However, the injunction against Redmond's immediate employment at Quaker extends no further than necessary and was well within the district court's discretion.

For the foregoing reasons, we affirm the district court's order enjoining Redmond from assuming his responsibilities at Quaker through May, 1995, and preventing him forever from disclosing PCNA trade secrets and confidential information.

AFFIRMED.

---

**10.** The confidentiality agreement is also not invalid for want of a time limitation. *See* 765 ILCS 1065/8(b)(1) ("[A] contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographic limitation on the duty."). Nor is there any question

that the confidentiality agreement covers much of the information PepsiCo fears Redmond will necessarily use in his new employment with Quaker.

