She had reason to be afraid, the frequent, confided trips to Acapulco had aroused Flemmi's suspicions, and while she was off on these trips in the summer of 1981, Flemmi killed her mother-in-peace, insiders say and especially about checking on her, according to Victor Davis.

On Sept. 17, 1981, Debra Davis dropped her mother off after a shopping trip, kissed her goodbye, and drove off to meet Flemmi with a promise to call in a few minutes. That was the last time she was seen.

Flemmi apparently demanded that Davis remain with him, but

**Flemmi and Bulger hosted dinners for FBI agents at the South Boston home of Flemmi's mother — the same place where Debra Davis allegedly was slain.**

Debra Davis is believed to be buried in an eighty years of brush, in the outskirts of the edge of the Neponset River under the train tracks in Quincy.

At the same time that Flemmi shared an apartment with Davis, he was dating a Mandan Hussey, a woman he had been with after separating from his wife in the 1980s. Flemmi and Hussey had three children together, and she is accused of killing Hussey's daughter from another marriage.

In January, the remains of Deborah Hussey, who was just three years younger than Debra Davis, were unearthed from a malachite gum across from Hyster Hall in Dorchester. Flemmi had allegedly been killing an at his with Deborah Hussey since

she was a teenager. Flemmi and Bulger are accused of killing them early 1985.

Within 48 hours of Davis's disappearance, her mother reported her missing to Randolph police. FBI agents later interviewed Clip-Davis at length about her disappearance, but never contacted Flemmi about the cop, according to sources familiar with the investigation.

The Davis family has long suspected Flemmi of killing Debra Davis, and prosecutors told investigators get a major break in the case when longtime Bulger associate began cooperating with authorities in the past year.

In January, Bulger's trip depoview, Kevin Weeks, led investigators to the graves across from Florian Hall, where they unearthed the remains of Hussey and two Quincy men. Arthur "Bucky" Barrett and John McIntyre, who allegedly were killed by Bulger and Flemmi in 1983 and 1984.

Last month, investigators recovered the remains of a man believed to be Paul McGonagle from a grave at the edge of Tenean Beach in Dorchester. McGonagle, a Bulger rival, had disappeared in 1975, from a burial site at the edge of the Neponset River in Quincy.

Investigators from the Massachusetts State Police, the federal Drug Enforcement Administration, and the Internal Revenue Service, who've spearheaded the Bulger-Flemmi probe, were unable to locate Davis's remains, despite information that she was buried at the Quincy site.

Investigators have said they are not giving up on finding Davis.

EXHIBIT 2

UNDER SEAL

REDACTED

**SAFETY–KLEEN SYSTEMS, INC., Plaintiff,**

v.

**Michael McGINN, Defendant.**

**No. 02–CV–11319–MEL.**

United States District Court, D. Massachusetts.

Sept. 24, 2002.

Henry A. Sullivan, Josiah M. Black, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, Jeffrey S. Patterson, Nelson, Mullins, Riley & Scarborough, Columbia, SC, for Plaintiff.

Richard M. Zielinski, Hill & Barlow, Boston, Timothy A. Duffy, Michael B. Slade, Kirkland & Ellis, Chicago, IL, Ellen C. Meyer, Hill & Barlow, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER*

LASKER, District Judge.

Safety–Kleen, Inc., a corporation providing hazardous waste collection and recycling services, moves for a preliminary and permanent injunction restraining Michael McGinn, a former Safety–Kleen employee now working for Heritage Crystal–Clean (HCC), a Safety–Kleen competitor, from working in any sales or service capacity for HCC or any other Safety–Kleen competitor for a period of one year; from working, in any capacity, for HCC or any other Safety–Kleen competitor in any geographic region in which he previously worked for Safety–Kleen, for a period of one year; from using or disclosing any of Safety–Kleen's confidential information at any time; and from soliciting any of Safety–Kleen's customers or employees for a period of one year.

Safety–Kleen's motion is denied.

## I.

McGinn was employed by Safety–Kleen from October 1984 until May 2002. In the final four-and-a-half years of his employment, he worked as District Manager for Safety–Kleen's New England district, supervising branch facilities in Vermont, New Hampshire, Maine, Massachusetts and Rhode Island. For a short period, he also supervised branches in upstate New York and Erie, Pennsylvania. McGinn earlier worked as a branch manager trainer, training all new branch managers for the Central and Midwestern United States.

On May 17, 2002, McGinn notified Safety–Kleen of his resignation. In June he began working for HCC in Harrisburg, Pennsylvania, where he is developing a new HCC branch.

McGinn signed several employment agreements and restrictive covenants with Safety–Kleen during his employment. The most recent, a Non–Competition and Non–Disclosure Agreement executed on September 4, 2001, is the subject of the present action. The Agreement provides in pertinent part that McGinn will not, for a period of one year after the date of termination of his employment, (1) engage "in any business which provides products and/or services similar to those provided by the Company" within McGinn's "Geographic Area," (2) solicit business from any "person, firm, or corporation, who or which was a customer or prospect of the Company in the Geographic Area, during Employee's employment with the Company and with whom Employee had business contact while employed by the Company," or (3) disclose any of Safety–Kleen's confidential information without limitation as to time or location. "Geographic Area" is defined as "[w]ithin any county in any state in which Employee provides services for the Company during his employment, or conducts business."

The parties agree that McGinn is working for a Safety–Kleen competitor, and that Harrisburg lies outside the geographic area in which McGinn previously worked for Safety–Kleen. The principal disputes revolve around McGinn's alleged disclosure of Safety–Kleen's confidential information and his solicitation of Safety–Kleen customers in Harrisburg.

## II.

As prerequisites for preliminary injunctive relief, a plaintiff must establish that (1) it has a substantial likelihood of success on the merits, (2) there exists, absent injunctive relief, a significant risk of irreparable harm to it, (3) the balance of hardship weighs in its favor, and (4) granting the injunction will not negatively affect the public interest. *TEC Engineering Corp. v. Budget Molders Supply Inc.,* 82 F.3d 542, 544 (1st Cir.1996).

## III.

### A. *Likelihood of success on the merits*

Safety–Kleen asserts that, as New England District Manager, McGinn had access to significant confidential customer information. It further contends that at a national Safety–Kleen sales conference in April 2002, which McGinn attended, the company made a number of presentations on confidential new marketing and management strategies. Safety–Kleen makes much of the fact that McGinn attended this conference after negotiating with HCC for a position and filling out an HCC employee "start packet" that included insurance enrollment and direct deposit forms. Safety–Kleen points to the sequence of events as evidence of bad faith on McGinn's part. It argues that under the circumstances, it would be impossible for McGinn to work in a sales or service position for a Safety–Kleen competitor anywhere in the country, or solicit Safety–Kleen customers any-

where in the country, without disclosing some of the confidential information he gained during his time at Safety–Kleen. It seeks an injunction restraining McGinn from working for a competitor or soliciting Safety–Kleen customers on a theory of "inevitable disclosure." *See PepsiCo, Inc. v. Redmond,* 54 F.3d 1262 (7th Cir.1995) (affirming grant of injunctive relief on the basis of a showing that defendant "[could not] help but rely on [plaintiff's] trade secrets as he helps plot [a competitor's] new course").

McGinn responds that *PepsiCo* is distinguishable from the facts of the present case and that as a matter of law, the inevitable disclosure doctrine does not apply in this case. The *PepsiCo* court, McGinn argues, applied an Illinois statute empowering the court to enjoin "actual *or threatened* misappropriation of a trade secret." 765 ILCS 1065/3(a) (emphasis added). In contrast, the Massachusetts statute, which governs in this case, requires a showing that the employee "has used" a trade secret improperly. M.G.L. Ch. 93 § 42A. Moreover, McGinn disputes the factual allegation that he acquired a significant amount of confidential information regarding customers or marketing, contending that he had little customer contact as Regional Manager and that the sales conference he attended was more of a pep rally than a substantive event. He further asserts that he had and has no hand in shaping HCC's sales or marketing initiatives. He states that his present solicitation method on behalf of HCC consists of driving down the street, "cold calling" on businesses that may be in need of HCC's services, and that he discloses no confidential Safety–Kleen information in the process. Finally, he asserts that he has not solicited any customer with whom he had contact while a Safety–Kleen employee.

Safety–Kleen has failed to show a likelihood of success on the merits of these claims. Safety–Kleen has not established the occurrence of any actual disclosure by McGinn. For the reasons cited by McGinn, *Pespico* is distinguishable from the present case. Regardless of how much confidential information McGinn possesses (itself a matter of dispute), Massachusetts law provides no basis for an injunction without a showing of actual disclosure.

■ Moreover, Safety–Kleen has failed to produce evidence that McGinn has breached the agreement by soliciting any customers with whom he was in contact while at Safety–Kleen. This is the only type of solicitation prohibited by the Agreement. For the reasons cited above, the inevitable disclosure doctrine does not apply to this case, and there is thus no legal basis for extending the scope of the Agreement in the manner requested.

B. *Irreparable Harm, Balance of Hardships, and Public Interest*

■ Since Safety–Kleen has failed to establish a likelihood of success on the merits, it is unnecessary to deal in depth with the issues of irreparable harm, the balance of hardships, and the public interest. However, on the present record, Safety–Kleen has not established that it is being harmed at all (much less irreparably). It also appears, on the present record, that the balance of hardships would favor an individual defendant, such as McGinn, whose livelihood would be seriously and adversely disrupted. The public interest in this dispute, while not adversely affected, is minimal.

*IV.*

The motion for a preliminary and permanent injunction is DENIED. McGinn remains under a contractual duty not to violate the terms of the Agreement. If evidence is introduced at trial indicating

that he has done so, this court will be prepared to impose sanctions.

It is so ordered.