**LA CALHÈNE, INC., Plaintiff,**

v.

**James J. SPOLYAR, Defendant.**

**No. 96–C–0566–C.**

United States District Court,
W.D. Wisconsin.

Aug. 23, 1996.

Mark B. Pollack, Galanis, Pollack & Jacobs, S.C., Milwaukee, WI, for Plaintiff.

Ronald R. Kirchoff, Felhaber Larson Feulon & Vogt, Minneapolis, MN, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

This civil case for injunctive relief is before the court on the motion of plaintiff La Calhéne, Inc. for a preliminary injunction prohibiting defendant James J. Spolyar from disclosing trade secret information he obtained in the course of his employment with plaintiff as chief operating officer and as president of plaintiff's sales and marketing division. Plaintiff has alleged in its complaint that defendant breached the non-competition and confidentiality provisions of his employment contract with plaintiff, that he breached his fiduciary duty to plaintiff, that he competed unfairly, that he interfered tortiously with plaintiff's contractual relations and prospective business advantage and that he misappropriated plaintiff's trade secrets in violation of Minn.Stat. § 325C.01–.08. On its motion for preliminary injunction, plaintiff has argued only its breach of contract and misappropriation of trade secret claims.

I conclude that plaintiff has shown more than a negligible likelihood that it will prevail ultimately on its claims against defendant.

It has identified several types of information in defendant's possession that qualify as trade secrets under Minnesota law and it has shown that it took reasonable steps to keep these matters secret. Plaintiff has shown, too, that it will suffer irreparable harm if the injunction does not issue, that the balance of harm tips in its favor and that the public interest will not be disserved by the issuance of the requested injunction.

An evidentiary hearing was held on plaintiff's motion on August 9 and 10, 1996. Additional evidence was adduced during a hearing in July on plaintiff's motion for a temporary restraining order. Solely for the purpose of deciding the pending motion for preliminary injunction, I find the following facts from the evidence adduced at the two hearings.

### FACTS

Plaintiff La Calhène, Inc., is a Delaware corporation that has its principal place of business in the state of Minnesota. It is a wholly owned subsidiary of SNE La Calhène, a French corporation. Defendant James J. Spolyar is a resident of the state of Wisconsin.

Plaintiff is in the business of selling isolator products (barrier enclosures with sterile environments) and associated technology. Isolator products are used for total containment of hazardous substances or for protection of products, the environment or personnel in the nuclear, electronic, medical and food industries. Plaintiff has been engaged in the design and sales of isolator technology since its incorporation in 1984. Its parent company, SNE La Calhène (France), has been selling protective equipment to the nuclear and pharmaceutical industries for about 35 years. Plaintiff and its parent company have a large share of the isolator technology business worldwide: about 40% of the market in the United States and Canada and about 70% of the market in Japan. La Calhène France spent about ten years developing workable applications of isolator technology for the nuclear industry and about the same amount of time converting its technology for the pharmaceutical company.

Plaintiff's primary focus is on isolator technology for the pharmaceutical industry. In the last ten years, its product line and that of its parent has changed from standard products to more customized products designed with specialized air flows and environments to meet the needs of the pharmaceutical industry for research, production or container filling in a sterile environment. La Calhène France employs three full-time engineers to develop new products and analyze the needs of the pharmaceutical industry. At present, approximately 50 to 70% of the annual sales of plaintiff and its parent represents custom products.

Generally, when a customer expresses interest in purchasing an isolator installation, it will advise plaintiff of its needs and what it hopes to achieve. Plaintiff will study the project, design an installation and make a mockup in cardboard and other inexpensive materials so as to study the ergonomics of the installation before manufacturing the project itself or sending it out for fabrication.

Engineering an effective isolator installation for a particular customer may require solving specific sterilization problems (ensuring that the sterilizing gas circulates throughout the isolators, that the materials within the isolator and the processing equipment are compatible with the sterilizing gas and that the isolator is designed so that the gas can be changed thoroughly and quickly for those customers who need a rapid turnaround of their equipment); ergonomics problems (designing the isolator so as to enable the personnel to operate the equipment inside as effectively as possible); and special cleaning needs (enabling the isolator to be cleaned thoroughly to remove all traces of the materials within the isolator and ensuring that sterility can be maintained in specific applications). Each custom installation raises special challenges and often requires the installer to make changes in the design as the project progresses and new problems surface. In the process, the company gains design and engineering experience that assists it in designing and bidding on future projects. In this regard, learning what does not work can be valuable in avoiding similar blind alleys in the future.

Defendant first became associated with plaintiff in 1988, when he worked as an independent contractor for a consulting firm retained by plaintiff. Defendant has experience in selling mutual funds and international funds; he has worked in Christmas tree sales; and he has done syndications in the Christmas tree, timber and real estate businesses. In the consulting firm, defendant worked with bankruptcy trustees on business workouts. In 1990, plaintiff retained defendant as a consultant and made him an officer of the company and a member of plaintiff's board of directors. In 1991, defendant's firm became a 10% stockholder of plaintiff; the stock was repurchased by plaintiff in 1994, when plaintiff decided to purchase a manufacturing facility in the United States and needed a large infusion of capital that defendant's group was not interested in making. In July 1994, plaintiff made defendant its chief operating officer. Later, when plaintiff became dissatisfied with defendant's performance as chief operating officer, it demoted him to president of plaintiff's sales and marketing division, a position he held until April 29, 1996, when his resignation from the company became effective.

When plaintiff hired defendant as a full-time employee and chief operating officer, the parties entered into an employment agreement dated July 1, 1994, which contained the following provisions:

5. Confidentiality—Non–Competition

5.1. Spolyar shall at all times treat as confidential all trade secrets, know-how, processes, systems, and other information of La Calhène and its affiliated companies, whether patented or not, whether under license or not, which is not generally known to the public in the field of activity of La Calhène and shall not disclose any such confidential information to any person not expressly authorized by La Calhène to receive such information. Spolyar's confidentiality obligations shall survive the termination of this Agreement.

5.2. Upon termination of this Agreement, Spolyar shall not participate in any way, directly or indirectly, either through direct or indirect ownership, employment or oth-

erwise, in any business which deals with or relates to products or services which are the same or similar to those manufactured and/or sold by La Calhène in the field of fine chemistry, pharmaceuticals and electronic components, for a period of one year in the American continents and Japan. In addition, Spolyar shall cease all contacts with any existing or prospective customers of La Calhène as well as with its suppliers, provided that Spolyar may maintain such contacts in the pursuit of business not competing, whether directly or indirectly, with that of La Calhène.

Plaintiff and defendant entered into an amendment to the employment agreement, dated January 1, 1996, that changed defendant's duties, compensation and provisions for termination. The amended agreement made no reference to paragraphs 5.1 and 5.2 of the original employment agreement. The amended employment agreement terminated on April 29, 1996. Plaintiff paid defendant $152,000 in termination pay.

After defendant left plaintiff's employ, he began work as an unsalaried, commissioned salesperson with Walker Stainless Equipment Company, a company that has fabricated rigid wall components as a subcontractor for plaintiff and has also designed and built isolator installations directly for customers. Walker Stainless competes with plaintiff for sales of isolator technology and is seeking to expand its isolator technology business. Since defendant began work at Walker, two other salespeople have left plaintiff to begin work for Walker, leaving only one salesperson at plaintiff out of its former sales force of four.

In the course of his employment with plaintiff, defendant received documents and information, including:

1) As many as 400 or more engineering drawings or technical specifications or both of isolator units built by plaintiff, as well as some of the custom-made units built by La Calhène France;

2) Lists of current and prospective customers that included descriptions of projects that had been built or were to be built, as well as potential projects on which

the company might bid, together with the estimated probability of obtaining the contract;

3) Information concerning plaintiff's gross margin percentages on its products;

4) Forecasts of projected sales figures for the years 1996–2000;

5) Pro forma income statements, balance sheets and cash flow and summaries of paid-in capital vs. debts, strategic and marketing plans;

6) Results of tests performed by the company on specific aspects of various isolators, such as mechanical and electrical components and for sterility and overall performance;

7) Information regarding projects and approaches that had failed;

8) Research and development efforts;

9) Integration of manufacturing and engineering; and

10) Sales volume by salesperson.

Plaintiff does not have a formal program of identifying documents or other items considered to be trade secrets. It does not use a confidentiality stamp on documents or keep records of confidential information or maintain a records retrieval policy or records destruction program. Plaintiff does not have procedures in place to keep confidential documents out of the hands of persons outside the company. It has no policy on leaving documents on desks or photocopying sensitive documents. It does not post security guards, screen visitors or require visitors to wear badges while inside the facility. However, plaintiff does not allow visitors to wander about its facility unaccompanied. Plaintiff does not keep sensitive documents in locked cabinets and it does not have a written exit program under which departing employees are required to account for documents in their possession. As chief operating officer of plaintiff, defendant was responsible for instituting and implementing a confidentiality policy.

Plaintiff protects the dissemination of confidential information by controlling the number of persons within the company who receive such information. For example, the five year strategy plan went to only three people in the plaintiff company (one of whom was defendant). The upper management employees with wide-ranging access to confidential materials were required to sign confidentiality agreements like the one defendant signed. Plaintiff relies on the good sense of its employees not to give customers or competitors sensitive information. It is the common understanding of the salespeople that lists of customers and completed projects and drawings of installations should not be circulated outside the company or shown to anyone other than a customer when use of the list or drawings might help secure a sale. (When drawings were shown to customers, the sales staff takes care not to breach the confidentiality of the customer for whom the drawing had been prepared originally.) It was not plaintiff's practice to leave its customer lists or of its drawings with customers.

Plaintiff distributed to its sales force lists of customers and installations that were completed or in progress. The salespersons could use the lists as selling tools, showing a prospective customer that another company had ordered an isolator installation for a similar kind of process. The customer could then talk to people who were working with a particular installation to learn what its experience had been with plaintiff and with the product. Otherwise, these lists are not circulated beyond the company. However, salespersons often learn of their competitors' installations, either by word of mouth, while visiting customers, or because bidding information about any particular installation is usually made available to a number of companies.

In addition to the lists of past projects sold, individual salesmen keep lists of present and prospective customers and information about the customers, such as what they may be thinking of buying and for what purposes, how likely it is that the customer will place an order, tentative price calculations and some specifications. Each salesman submits a monthly report noting his activities, the people with whom he has spoken and the subject of the talks. While defendant was working for plaintiff, he received all of these reports. Plaintiff's sales force keeps abreast of fabrication information so that they know

where problems in fabrication are occurring and can steer future customers away from problematic designs or raise their price bids to reflect the higher costs of fabricating a particular installation.

Employees and officers of plaintiff have made presentations at industry conferences, describing new products and solutions to various barrier technology problems. When they make the presentations, they avoid giving out information that is so detailed it would provide competitive advantage to others in the industry.

Competitors with access to information about plaintiff's pricing and margins and with knowledge of the various solutions to customer needs that plaintiff had used successfully or unsuccessfully in the past would have an advantage over plaintiff in obtaining business. With knowledge of plaintiff's pricing and margins, competitors could underbid plaintiff. The isolator technology industry is highly competitive and price-sensitive. Information about sales trends is of value to competitors because it enables them to see the market from their competitor's point of view and to know the areas in which the competitor intends to expand. Gross margin information would give another company a reference check for its own business plan.

When defendant began work with plaintiff, he knew nothing about the isolator business. Whatever he knows now about the business has come from plaintiff's employees and from business trips to sites of plaintiff's installations. Defendant participated in many meetings at which the company's research and development efforts and future marketing plans were discussed. In disclosing the company's confidential information to defendant, plaintiff relied on the confidentiality agreement he had signed as part of his employment agreement and the confidentiality agreement he had signed on behalf of plaintiff when plaintiff entered into an agreement with SNE La Calhène for the licensing of La Calhène France's products.

At the time defendant left plaintiff's employ, the company had four full-time salespeople, a broker in Mexico, a broker for South America, a broker for Canada and broker in Chicago servicing the Midwest.

In early August 1996, while affiliated with Walker Stainless, defendant assisted Bill Friedheim in drafting a letter announcing Friedheim's new job as salesman for Walker Stainless. Since defendant terminated his employment with plaintiff, he has talked to all but one of the customers to whom he had submitted bids on isolator installations on behalf of plaintiff. In one instance, he learned that the customer was going to rebid a project on which plaintiff had bid previously and was able to bid the modified project on behalf of Walker Stainless.

## OPINION

### A.  *Choice of Law*

At the outset it is necessary to determine the law that applies to plaintiff's breach of contract and misappropriation of trade secrets claims. Although plaintiff filed its suit here (presumably because this is the district in which defendant now resides), the parties have no real ties with this state. They entered into the employment agreement in New York but plaintiff's headquarters is in Minnesota and defendant was to perform his duties there.

■ Plaintiff contends that the Minnesota Trade Secrets Act applies to its misappropriation of trade secrets claim and that, under the grouping-of-contacts approach, a Wisconsin court would apply Minnesota law to the contract claim as it relates to the confidentiality provisions, but would apply Wisconsin law to the non-compete provision because Wisconsin courts will not apply a foreign state law that conflicts with Wisconsin law on a particular subject. Minnesota allows the "blue penciling" of otherwise invalid non-compete provisions to delete or modify the objectionable portions; Wisconsin does not. *General Medical Corp. v. Kobs,* 179 Wis.2d 422, 428, 507 N.W.2d 381, 385 (Ct.App.1993) (Wis.Stat. § 103.465 prohibits courts from redrafting otherwise invalid non-compete provisions in employment agreements; courts will not apply foreign law that contravenes a fundamental policy of the state of Wisconsin).

Defendant does not object to the plaintiff's analysis of the choice-of-law decision. For

the purpose of deciding this motion, I will assume that plaintiff is correct.

### B. Standard for Issuance of a Preliminary Injunction

#### 1. Likelihood of success on the merits

■ In order to succeed ultimately on the merits of its suit, plaintiff must show that the information at issue constitutes trade secrets and that defendant either misappropriated the information or breached his agreement to keep it confidential. *Nalco Chemical Co. v. Hydro Technologies, Inc.*, 149 F.R.D. 686, 691 (W.D.Wis.1993). Plaintiff has shown that it is likely that trade secret protection will apply to the approximately 400 engineering drawings of past installations (hearing exhibit # 10); the results of tests performed by the company on specific aspects of various isolators; the forecasts of projected sales figures for the years 1996–2000, the pro forma statements, paid-in capital and debt and the gross margin information (hearing exhibit # 7); and the research and development information and knowledge of the integration of manufacturing and engineering that defendant gained by virtue of his management positions. This information meets the test for trade secrets set out in the Uniform Trade Secrets Act: it derives economic value from not being generally known to or readily ascertainable by other persons who can obtain economic value from its disclosure or use and plaintiff has employed reasonable efforts to keep it secret. Minn.Stat. § 325C.01(5).

■ I conclude that the detailed customer lists (deposition exhibit # 19) do not meet the criteria for trade secrets because the information contained in those lists is general in nature and much of it was readily obtainable from other sources. *See Corroon & Black–Rutters & Roberts, Inc. v. Hosch*, 109 Wis.2d 290, 325 N.W.2d 883 (1982) (detailed lists of customers, including information on policy expiration dates, did not merit trade secret protection because they were merely outgrowth of normal marketing endeavors and would have been compiled with or without legal protection as incentive). It is true that in determining the trade secret status of customer lists, the Supreme Court of Wisconsin has referred approvingly to the com-

ments of the Indiana Court of Appeals in *Steenhoven v. College Life Insurance Co. of America*, 460 N.E.2d 973, 974 n. 5 (Ind.Ct. App.1984) (quoted in *Minuteman, Inc. v. Alexander*, 147 Wis.2d 842, 856, 434 N.W.2d 773, 779 (1989)), to the effect that customer lists should not automatically be denied trade secret status. In *Steenhoven*, the court suggested that trade secret status might attach to a customer list if it is shown that the market is one that is "intensely purchaser-oriented," such as one in which identical or nearly identical products or services are sold to a small, fixed group of purchasers. The isolator business is a relatively small one. However, plaintiff's own testimony is that its products have a special cachet in the market and that the company itself is considered a leader in technology. These assertions do not square with the criteria identified in *Steenhoven*.

The Minnesota courts have recognized that customer lists may constitute trade secrets if the information on the lists is not "readily ascertainable." For example, in *Cherne Industrial, Inc. v. Grounds & Assoc., Inc.*, 278 N.W.2d 81, 90 (Minn.1979), the court gave trade secret protection to a customer list of consulting engineers working on projects that had been compiled by its national network of independent representatives. The company had spent a number of years identifying engineers who were prospective customers for the operating and maintenance manuals it sold. Neither the names of these engineers nor their projects were generally known or readily obtainable. In contrast, plaintiff's list of customers is compiled from a much smaller group of large pharmaceutical companies and contains little additional information that is not readily obtainable.

■ With respect to the "not generally known" requirement as it relates to the matters I have identified as trade secrets, defendant adduced evidence from experts in the field that many of plaintiff's installations could be "reverse engineered," that is, plaintiff's products could be purchased, brought into a competitor's facility, taken apart, analyzed and used as the bases for similar product designs. This evidence does not establish that the engineering drawings are not

trade secrets. *See* Commissioners' Comments, *Uniform Trade Secrets Act*, § 2, 14 U.L.A. 544–45 (1985) (quoted in *Minuteman, Inc.*, 147 Wis.2d at 857, 434 N.W.2d 773) (possibility of reverse engineering a trade secret is a factor in determining how long injunctive relief should last, but it does not establish necessarily that information is not a trade secret). *See also Electro–Craft Corp. v. Controlled Motion*, 332 N.W.2d 890, 899 (Minn.1983) (finding that competitor could not *readily* reverse engineer motor with exact dimensions of allegedly protected motor can support finding that information is trade secret; time required to reverse engineer product is "factor in determining whether information is *readily ascertainable*") (emphasis added). Certainly, many of plaintiff's standard products and installations could be reverse engineered, albeit not within the short time that defendant postulated. However, it would be considerably more difficult to do this with the custom installations for which the specific requirements cover a wide range of possible configurations, component parts and special designs. What would be useful to a competitor is the whole panoply of engineering drawings plaintiff had accumulated, together with the results of the various tests it had run on technical aspects of the isolators, and information about past mistakes that had been made and wrong turns taken. Defendant contends that this information was in the public realm because each customer had received a copy of the drawings of its own installation but the trade secret aspect is the entirety of the drawings. The fact that different customers have copies of their own project drawings does not render the full set of drawings less valuable. No evidence exists to prove that this set was ever given or shown to anyone outside the company.

Defendant downplays the confidential nature of the engineering drawings, asserting that detailed technical information about isolators is available at industry seminars and in the industry literature. He points out that many of plaintiff's own employees presented papers at seminars. However, the testimony of the officers of plaintiff's parent and of plaintiff's chief competitor was that the seminar presentations tended to avoid specific details of installations that would reveal proprietary information. Common sense supports the credibility of this testimony. Companies in an industry such as isolator technology are not going to give away information that will enable their competitors to gain an economic advantage over them.

■ Plaintiff's strategic and marketing plans are subject to protection. The evidence is that these plans were seen by only a small number of the officers of plaintiff and its parent. The salespeople were provided one page of the document; they were not given copies of any other pages. Such information is highly valuable to competitors and is the product of time and effort on the part of plaintiff.

■ Finally, plaintiff's ongoing efforts in research and development and in integrating manufacturing and engineering are trade secrets. Plaintiff and its parent kept these efforts confidential; only a few people were privy to the work that was being done.

At the evidentiary hearing, defendant devoted a great deal of time to trying to show that the information at issue did not meet the definition of trade secrets because plaintiff had made inadequate efforts to maintain its secrecy. I conclude, however, that the steps plaintiff took were reasonable under the circumstances. Primarily, plaintiff restricted the number of people who had access to confidential information. At the Rush City plant, visitors were not permitted to move through the building without escort. Plaintiff made a confidentiality provision part of its employment agreement with defendant and other high ranking employees and its parent company imposed a confidentiality requirement upon plaintiff in connection with the licensing of the parent's products. Finally, the initiation and execution of a confidentiality policy fell within defendant's area of responsibility, as chief operating officer. It would be ironic, and unfair to plaintiff, if defendant's failure to take proper measures to protect plaintiff's confidential information and knowledge base inured to his benefit.

■ Plaintiff has not shown that defendant has actually misappropriated any of its

trade secrets, that is, put them to use. Plaintiff does not need to make this showing in order to obtain a preliminary injunction. It is sufficient to show the threat of misappropriation. Minn.Stat. § 325C.02 provides that a court may enjoin an actual or threatened misappropriation. The threat of misappropriation is very real. Defendant's position with plaintiff gave him such intimate knowledge of plaintiff's research, product development, finances, marketing strategies and pricing information that it is all but inevitable that he will utilize that knowledge during his work with Walker Stainless or any other competitor of plaintiff, so long as he is selling a competing product. *See Teradyne, Inc. v. Clear Communications Corp.*, 707 F.Supp. 353, 356 (N.D.Ill.1989) (threatened misappropriation can be enjoined "where there is high degree of probability of inevitable and immediate ... use of ... trade secrets"). *See also PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir.1995) (citing *Teradyne* standard for threatened misappropriation with approval and holding that former general manager of PepsiCo's California region could not oversee marketing of competitor without relying inevitably on his knowledge of PepsiCo's trade secrets "unless [he] possessed an uncanny ability to compartmentalize information"); *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir.1986) (affirming preliminary injunction enjoining former director of product for Mercury Marine's MerCruiser division from going to work for competing firm because of confidential information he possessed concerning former employer's engineering failures and successes, financial performance and projections and marketing plans, all of which would enable competitor to develop new product more cheaply and quickly than Mercury Marine "by avoiding engineering blind alleys," "by determin[ing] how aggressively it should price the products" and "by [preempting Mercury's] new products before they reached the market").

■ Defendant is like PepsiCo's general manager and Mercury Marine's product director. He has such intimate knowledge of plaintiff's business that he could not engage in a competing business, selling to the same customers, without inevitably relying on his knowledge of plaintiff's trade secrets. The threat of this misuse is enough to establish the likelihood that plaintiff will prevail ultimately on the merits of its claims of misappropriation of trade secrets and breach of contractual duty of confidentiality.

**2.  *Irreparable harm and lack of adequate remedy at law***

Plaintiff will suffer irreparable harm for which there is no adequate remedy in law if the injunction does not issue. The loss of its trade secrets and the boost that acquisition of them will give to Walker Stainless is irretrievable. Plaintiff will be harmed if it loses its leadership role in the industry and the customer goodwill it has built up over the time it has been in business. In addition, it stands to lose sales, the value of which would be difficult to quantify.

**3.  *Balance of harms***

The balance of harms tips in plaintiff's favor. Although defendant will be hurt if he cannot work for a competing business because of the realistic possibility that he will divulge or rely upon plaintiff's trade secrets, he has a track record of employment in a number of fields and a demonstrated ability in sales that would carry over to sales of products that did not endanger the secrecy of plaintiff's confidential information. In addition, when defendant terminated his employment, plaintiff paid him an amount equal to approximately one year's salary and bonus.

**4.  *The public interest***

The public interest favors enforcement of contracts and the protection of trade secret information gathered and developed by a company at significant expense. A carefully drawn injunction will protect plaintiff's and the public's interests in the protection of trade secrets but will not place an undue burden on fair competition.

**5.  *Duration of injunction***

From the evidence adduced at the evidentiary hearings, I am convinced that no injunction against the disclosure of trade secrets should last more than one year from

the date of defendant's resignation on April 29, 1996. After one year, the information that defendant acquired while employed by plaintiff will have lost a good part of its economic value to plaintiff or to plaintiff's competitors. Plaintiff will have developed new inventions, new techniques and new market strategies and its competitors will have caught up to where it was in April 1996. At that point, it would be anti-competitive to continue to restrain defendant from using the information he has because the lead time a competitor could gain from defendant's misappropriation would have expired.

## ORDER

IT IS ORDERED that the motion of plaintiff La Calhène, Inc. for a preliminary injunction is GRANTED and defendant James J. Spolyar is ENJOINED PRELIMINARILY from

a) failing to return immediately to plaintiff any drawings or technical specifications of isolator units built by plaintiff and of certain custom-made units built by La Calhène France;

b) disclosing (1) strategic and marketing plans, (2) engineering drawings and specifications of isolator units previously manufactured by plaintiff and its affiliates, (3) pricing margins, (4) plaintiff's ongoing research development efforts, and (5) the knowledge of the process by which engineering and manufacturing are integrated;

c) participating directly or indirectly through employment or otherwise in businesses that deal with or relate to products or services that are the same or similar to those manufactured or sold by plaintiff in the field of fine chemistry, pharmaceuticals and electronic components in the American continents and Japan;

d) having any contacts with any of plaintiff's suppliers, with any of plaintiff's existing customers for isolator technology or with any prospective customers whose potential needs for isolator projects were being contemplated or developed and were known to defendant at the time he left plaintiff's employ; and

e) participating in the servicing of such customers by any business that deals with or

relates to products or services that are the same or similar to those manufactured by plaintiff in the field of chemistry, pharmaceuticals and electronic components, in the American continents and Japan or including any referrals to other personnel of such businesses.

This preliminary injunction shall cease of its own accord on April 30, 1997, if not amended or vacated prior to that date.