MAXXIM MEDICAL, INC., Plaintiff,

v.

Mark MICHELSON, Defendant.

No. Civ.A. H–99–0460.

United States District Court,
S.D. Texas,
Houston Division.

March 25, 1999.

David Van Susteren, Houston, TX, for Maxxim Medical Inc., plaintiff.

Julian Clark Martin, Vinson and Elkins, Houston, TX, for Mark Michelson, defendant.

### AMENDED MEMORANDUM OPINION AND ORDER

HARMON, District Judge.

The Court's order entered on March 12, 1999 (Instrument # 32), is hereby **VACATED,** and the following order is replaced in its stead. Pending before the

Court in the above referenced action is Plaintiff Maxim Medical Inc.'s ("Maxim") application for temporary injunction. After reviewing the record, Defendant Mark Michelson's opposition, the arguments of counsel, and the applicable law, the Court concludes that the application should be **GRANTED.**

### I. Background

This case involves the scope of a covenant not to compete agreement, confidentiality agreement, and non-solicitation agreement entered into by Maxim and its prior employee, Michelson. It also involves whether Michelson is liable for conversion, breach of fiduciary duty, and misappropriation of trade secrets. Maxim is a Texas corporation with, until 1997, its corporate headquarters located in Sugarland, Texas.[1] Maxim, among other things, provides doctors sterile prepackaged trays of medical utensils. Michelson was employed by Maxim and its predecessors in interest for several years as a salesman and a supervisor. Michelson lives in California, but in his most recent capacity for Maxim, he supervised ten salesmen that served clients not only in California, but also Nevada, and for a time, Arizona, and El Paso, Texas.

During his employment at Maxim, Michelson signed at least two stock option agreements. In consideration for receiving stock options, Michelson agreed not to compete with Maxim for a one year period and to keep Maxim's confidential information secret.

In January 1999, Michelson began to negotiate employment with another company, PHS. The day before Michelson resigned from Maxim, he exercised some of his stock options. He also requested a large batch of client information printed. The individual who received this request forwarded it to another office employee.

1. In the last year or so, Maxim moved its headquarters to Florida, but, Maxim still maintains an office in Sugarland.

Michelson contacted this office employee later and requested additional information. Because the request was so large, she started the printing job, but it would not be completed until later that evening. She left the list of requested information on her desk with a stapler on top of it. Before leaving, she noticed that Michelson was the last front office employee remaining.

The next day, the list was gone. After informing Michelson of such, Michelson told her that he had taken it. He also lied to her and told her that the client information she had printed was useless because the printing was off line. That same day, Michelson resigned from Maxim and started employment at PHS. After Maxim employees checked Michelson's laptop, they discovered that he had deleted a great deal of confidential company information from his hard drive.

## II. Discussion

■ A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 117 S.Ct. 1865, 1867, 138 L.Ed.2d 162 (1997) (citing 11A CHARLES A. WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948, pp. 129–130 (2d ed.1995)); *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir.1998). In meeting this burden, the plaintiff must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Morales*, 164 F.3d at 224. "The decision to grant or deny a preliminary injunction lies within the discretion of the district court and will be reversed on appeal only upon a showing of abuse of discretion." *House the Homeless, Inc. v. Widnall*, 94 F.3d 176,

180 (5th Cir.1996), *cert. denied*, 520 U.S. 1169, 117 S.Ct. 1434, 137 L.Ed.2d 541 (1997).

### A. Success on the merits

#### 1. Maxim's contract claims

■ To determine the likelihood of success on the merits, this Court must look to the standards provided by the substantive law. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir.1997). The first issue this Court must address is which state's substantive law should be applied. Maxim contends that Texas law should apply because the parties agreed to such via a choice of law provision in the stock option agreement. Michelson contends that California law should apply because the choice of law provision is unenforceable and California has the "most significant relationship" to this dispute.

■ A federal court customarily applies the choice of law rules of the forum in which it is located. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *King v. Douglass*, 973 F.Supp. 707, 723 (S.D.Tex. 1996) (citing *Klaxon*). With regard to breach of contract actions, Texas follows the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 (1971). *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex.1990). Section 187 states:

Law of the State Chosen by the Parties

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187. This issue of whether a covenant not to compete agreement is enforceable is not "one which the parties could have resolved by an explicit provision in their agreement". *DeSantis*, 793 S.W.2d at 678 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 cmt. d (1971)). Thus, section 187(1) is inapplicable, and the Court must look to section 187(2). *Id.* Generally, the Court should apply the law chosen by the parties under section 187(2), unless section 187(2)(b) applies,[2] which depends upon three determinations:

first, whether there is a state the law of which would apply under section 188 of the RESTATEMENT absent an effective choice of law by the parties, or in other words, whether a state has a more significant relationship with the parties and their transaction than the state they chose; second, whether that state has a materially greater interest than the chosen state in deciding whether this noncompetition agreement should be enforced; and third, whether that state's fundamental policy would be contravened by the application of the law of the chosen state in this case.

*Id.* Thus, the Court must determine whether: (1) California law would apply under section 188's significant relationship test;[3] and (2) California has a materially

2. *Id.* There is no contention that Texas lacks a substantial relationship to the parties and has no reasonable basis for its law to apply. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)(a).

3. Section 188 of the Restatement states:

Law Governing in Absence of Effective Choice by the Parties

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

Section 6 of the Restatement sets out the general principles by which the more specific rules are to be applied, and states:

Choice-of-Law Principles

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

greater interest than Texas in deciding whether the covenant not to compete between Maxim and Michelson should be enforced; and (3) California's public policy would be contravened by applying Texas law. *See id.*

 In this case, the place of contracting occurred in both California and Texas; but, Michelson executed the non-competition agreement in California. The negotiation of the contract occurred in both California and Texas. The place of performance of the contract was in California, Nevada, Arizona, and Texas. The location of the subject matter of the contract was in California. The domicile, residence, nationality, place of incorporation and place of business are also split between California and Texas. The factor that tips the balance to California is that the gist of the agreement was the performance of personal services, for the most part, in California. *See id.* This factor alone is generally conclusive in determining what state's law will apply.[4] Although Michelson performed some services for Texas, it is undisputed that the major portion of his services were rendered in California. Thus, under the significant relationship test, California law would apply.

The next question is whether California has a materially greater interest than Texas in deciding whether the covenant not to compete between Maxim and Michelson should be enforced. Like the Texas Supreme Court in *DeSantis*,[5] California courts similarly hold that where a California employee is involved, California has a materially greater interest in the application of its law because of that state's strong public policy against noncompeti-

---

(g) ease in the determination and application of the law to be applied.

**4.** *Id.* Section 196 states:

Contracts for the Rendition of Services
The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, *or a major portion of the services,* be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.
RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 196 (emphasis added). The fact that some services were not performed in California is of less import because section 196, by its plain terms, is applicable where a major portion of the services are performed in a given state.

**5.** Maxim argues that this case is different that *Desantis*. Maxim contends that *Desantis* involved an employee who worked solely in Florida and that in this case, Michelson worked in several states, including, for a time, Texas. A close reading of *Desantis* reveals that the Texas Supreme Court directly spoke to Maxim's contention:

When parties to a contract reside or expect to perform their respective obligations *in multiple jurisdictions,* they may be uncertain as to what jurisdiction's law will govern construction and enforcement of the contract. To avoid this uncertainty, they may express in their agreement their own choice that the law of a specified jurisdiction apply to their agreement. Judicial respect for their choice advances the policy of protecting their expectations. This conflict of laws concept has come to be referred to as party autonomy. *However, the parties' freedom to choose what jurisdiction's law will apply to their agreement cannot be unlimited.* They cannot require that their contract be governed by the law of a jurisdiction which has no relation whatever to them or their agreement. And *they cannot by agreement thwart or offend the public policy of the state the law of which ought otherwise to apply.*
*DeSantis*, 793 S.W.2d at 677 (emphasis added and citations omitted). The court further elaborated on this concept of limited autonomy in the context of section 187 of the Restatement. As delineated *supra*, the party must show two things: (1) there is a reasonable relationship between the state of the law to be applied and the contract in question; and (2) the application of this law does not offend the public policy of a state that has a greater interest. In this case, Maxim's attempt to distinguish *Desantis* solely relates to the first of these two categories, *i.e.,* that Texas has a reasonable relationship here. The problem with Maxim's contention is that it fails to take into account the second category, the public policy aspect of the rule.

tion covenants. *Nedlloyd Lines B.V. v. Superior Court,* 3 Cal.4th 459, 465–66, 834 P.2d 1148, 1151–52, 11 Cal.Rptr.2d 330, 333–34 (Cal.1992); *Application Group, Inc. v. Hunter Group, Inc.,* 61 Cal.App.4th 881, 900, 72 Cal.Rptr.2d 73, 85 (1st Dist. 1998, review denied); *Scott v. Snelling and Snelling, Inc.,* 732 F.Supp. 1034, 1041 (N.D.Cal.1990). In this case, it is true that Michelson performed some services for a brief time in Texas; however, the vast majority of services were performed in California. There is nothing in the record that would lead this Court to believe that Texas has a materially greater interest in this matter than California. *See Nedlloyd,* 3 Cal.4th at 466 n. 6, 834 P.2d at 1152 n. 6, 11 Cal.Rptr.2d at 334 n. 6 ("There may also be instances when the chosen state has a materially greater interest in the matter than does California, but enforce- ment of the law of the chosen state would lead to a result contrary to a fundamental policy of California. In some such cases, enforcement of the law of the chosen state may be appropriate despite California's policy to the contrary. Careful consider- ation, however, of California's policy and the other state's interest would be re- quired.") (citation omitted).

The final question to be addressed is whether California's public policy would be contravened if this Court were to apply Texas law. California has promulgated Section 16600 of the California Business & Professions Code which states, "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." One of the few exceptions to Section 16600 is where the covenant is necessary to protect trade secrets of the employer. *See Mug- gill v. Reuben H. Donnelley Corp.,* 62 Cal.2d 239, 242, 398 P.2d 147, 149, 42 Cal.Rptr. 107, 109 (Cal.1965); *Metro Traf- fic Control, Inc. v. Shadow Traffic Net- work,* 22 Cal.App.4th 853, 860–61, 27 Cal. Rptr.2d 573, 577–78 (2d Dist.1994); *John F. Matull & Assocs., Inc. v. Cloutier,* 194 Cal.App.3d 1049, 1054, 240 Cal.Rptr. 211,

214 (2d Dist.1987); *Loral Corp. v. Moyes,* 174 Cal.App.3d 268, 276, 219 Cal.Rptr. 836, 841 (6th Dist.1985).

Texas law permits noncompeti- tion covenants to the extent that they are reasonable and ancillary to an otherwise enforceable agreement. *See DeSantis,* 793 S.W.2d at 681–82. Thus, to the extent that it is reasonable, the agreement in this case would be completely enforceable in Texas. As mentioned *supra,* however, it would only be enforceable in California to the extent necessary to protect Maxim's trade secrets. Thus, if this Court were to apply Texas law, California's public policy in pre- venting broad noncompetition covenants would be contravened. *Cf. Team Envtl. Servs., Inc. v. Addison,* 2 F.3d 124, 126 n. 1 (5th Cir.1993) (notwithstanding Texas choice of law provision, Louisiana had greater interest because of strong public policy against covenants not to compete)

Because California law would apply un- der section 188's significant relationship test, California has a materially greater interest than Texas, and California's public policy would be contravened by applying Texas law, this Court will apply California law to determine the enforceability of the covenant not to compete between Michel- son and Maxim.

Because the broad noncompetition agreement would be unenforceable in Cali- fornia absent reformation, the Court must determine whether reformation is appro- priate. The noncompetition agreement in this case contains the following passage:

> The parties understand and agree that if any of the restrictions placed upon the Optionee herein relating to time, geo- graphical area or scope of activity are deemed more extensive than is neces- sary to protect the good will or other business interests of the Company under the laws of the State of Texas (or any other jurisdiction in which the employee may be actually employed and by reason of which the law of such other jurisdic- tion properly applies with respect to in-

terpretation of Sections 6 or 7 hereof), then the parties hereto agree to amend the terms hereof to such time, geographical area and scope of activity and alter the degree and extent of such provisions by the minimal amount of amendment or alteration necessary to bring such provisions within the ambit of enforceability with the State of Texas.

Plaintiff's Ex. 1, p. 3 (emphasis added).

A recent California decision is dispositive of the reformation issue. In *Kolani v. Gluska*, 64 Cal.App.4th 402, 407–08, 75 Cal.Rptr.2d 257, 259–60 (2d Dist.1998), the court struck down a similarly broad noncompetition agreement because it could not be reformed. First, the court noted that agreements are only generally reformed if the parties made a mistake. *Id.*, 64 Cal.App.4th at 408, 75 Cal.Rptr.2d at 260. The parties in *Kolani*, however, merely entered into an illegal contract; there was no allegation or evidence of mistake. *Id.* Second, the court noted that the parties only agreed that the noncompetition agreement could be reformed if it were found "unfair" or "commercially unreasonable," not if it were merely illegal. *Id.* Third, the court held that any reformation would undermine the important public policy that is protected by section 16600:

> Employers could insert broad, facially illegal covenants not to compete in their employment contracts. Many, perhaps most employees, would honor these clauses without consulting counsel or challenging the clause in court, thus directly undermining the statutory policy favoring competition. Employers would have no disincentive to use the broad, illegal clauses if permitted to retreat to a narrow, lawful construction in the event of litigation.

*Id.* The Kolani court pointed out that no California case had permitted the reforma-

tion of an illegal noncompetition agreement. *Id.*

■ Like *Kolani*, there is no allegation of mistake in the drafting of the noncompetition agreement. Furthermore, the reformation provision at issue would only permit this Court to reform the broad agreement where Maxim's goodwill or other business interest did not require it to be as lengthy, as geographically expansive, or as restrictive in its terms. Although the agreement is too restrictive, it is not necessarily more restrictive "than is necessary to protect Maxim's goodwill or other business interest." Maxim may well need this expansive agreement to protect its goodwill and business interests. The problem is, as discussed *supra*, the California legislature has determined that such an agreement is void. Finally, as in *Kolani*, this noncompetition agreement is very broad. Any reformation of the illegal noncompetition agreement would undermine the public policy of section 16600. Maxim would have no disincentive to use this broad, illegal clause in the future if this Court permitted it to retreat to a narrow, lawful construction in this litigation. *Id.* Thus, the noncompetition agreement cannot be reformed into a narrower agreement strictly limited to trade secrets.

■ California's section 16600, however, does not apply to the confidentiality and nonsolicitation agreements. *Cloutier*, 194 Cal.App.3d at 1054, 240 Cal.Rptr. at 214; *Moyes*, 174 Cal.App.3d at 276, 219 Cal.Rptr. at 841; *In re Ingle Co., Inc.*, 116 F.3d 1485, 1997 WL 8495, at *3–5 (9th Cir.1997). Thus, unlike the noncompetition agreement, there is no public policy that would be contravened by the application of Texas law as the parties contractually agreed.

With regard to the nonsolicitation agreement,[6] Maxim did not provide any evidence

---

**6.** In the noncompetition agreement, Michelson also agreed "that for so long as he is employed by the Company [Maxim], and for one (1) year thereafter, he will not, either directly or indirectly, through any person, firm, association, or corporation with which he is now or may hereafter become associated, cause or induce any present or future employee of the Company [Maxim] to leave the employ of the Company to accept employ-

that Michelson had solicited any employees from Maxim.[7] Thus, this agreement is not at issue.

 Maxim alleges that Michelson breached the confidentiality agreement[8] when he turned over the stock option agreement before he was hired by PHS out of concern over the noncompetition agreement. At the preliminary injunction hearing, both Michelson and the vice-president of PHS testified that Michelson had divulged the contents of his stock option agreement when discussing potential employment with PHS. Salary and benefit information not available to the public is confidential. *See, e.g., Totino v. Alexander & Assocs., Inc.,* No. 01–97–01204–CV, 1998 WL 552818, at *6 (Tex.App.—Houston [1st Dist.] 1998, no pet.) (slip opinion) ("Finally, Totino admitted he had access to financial information and had knowledge of A & A personnel, including their salaries and benefits, by virtue of his position with A & A. Therefore, the trial court would not have

abused its discretion in concluding that at least some of the information on which the confidentiality agreements were based was confidential and ·nonpublic."). Although the Court understands Michelson's concern over the noncompetition agreement, the proper course of conduct would have been to have had his own attorney examine the document, as opposed to divulging the contents of Maxim's stock option agreement to Maxim's direct competitor. Thus, there is a substantial likelihood that Maxim will prevail on its claim premised on the breach of the confidentiality agreement.

### 2. Maxim's tort claims

 Maxim also alleges several tort claims. As in the breach of contract claims, this Court must determine which state's substantive law should apply. Texas has adopted the "most significant relationship" test, as enunciated in Sections 6[9] and 145[10] of the RESTATEMENT (SECOND) OF

---

ment with the Optionee [Michelson] or with any Competitor [PHS]." Plaintiff's Ex. 2, p. 3.

7. At the hearing on this matter, John Winslow, Maxim's representative and Michelson's former supervisor, testified that he thought Michelson just going to a competitor would indirectly induce Maxim employees to leave the employ of Maxim. If this Court were to accept this assertion, no employee could ever leave Maxim and the non-solicitation agreement would act in effect as a covenant not to compete. Nonetheless, even if it were true, there is no evidence that a Maxim employee has left since Michelson resigned.

8. The confidentiality agreement portion of the stock option agreement stated in relevant part:
*Nondisclosure of Company Secrets.* The Optionee acknowledges that in the course of his employment or other relationship with the Company, he has had and may continue to have access to certain trade secrets and proprietary information of the Company, knowhow, programs, lists of customers, information regarding inventions, . . . and other confidential information and knowledge concerning the business of the Company (hereinafter collectively referred to as the "Information") which the Company desires to protect. The Optionee understands that the Information is confidential and has been or will be received

or learned by him in confidence, and the Optionee agrees that unless and until such information shall become a matter of public knowledge, he will not reveal any such Information to any third party for any reason or under any circumstances, either during or subsequent to his employment by the Company, other than in the ordinary course of his duties for the benefit of the Company, or as required by applicable law.
Plaintiff's Ex. 2, p. 4.

9. *See supra,* note 3 (setting out section 6 in full).

10. Section 145 lists factual matters to be considered when applying the principles of Section 6 to a tort case, and states:
The General Principle
(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in S6.
(2) Contacts to be taken into account in applying the principles of S6 to determine the law applicable to an issue include:
(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,

CONFLICTS OF LAWS, to resolve all conflict of law cases sounding in tort. *Gutierrez v. Collins,* 583 S.W.2d 312, 318 (Tex.1979); *Danner v. Staggs,* 680 F.2d 427, 429 (5th Cir.1982) (citing *Gutierrez* ). The test provides that " 'law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue.' " *Caton v. Leach Corp.,* 896 F.2d 939, 943 (5th Cir.1990) (quoting *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex.1984)). The application of the " 'most significant relationship' test does not 'turn on the number of contacts,' but more importantly on the qualitative nature of those contacts as affected by the policy factors enumerated in Section 6." *De Aguilar v. Boeing Co.,* 47 F.3d 1404, 1413 (5th Cir.1995) (quoting *Gutierrez,* 583 S.W.2d at 318). Furthermore, the RESTATEMENT reveals an emphasis on the situs of the injury, at least with respect to the application of Section 145. RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 156.[11]

■■■■ Since the "locus of the conduct" is in California, the Court believes that California has a "greater interest in seeing that its standard of care is applied" because of the affect it will have on the way parties tailor their conduct within the state. *De Aguilar,* 47 F.3d at 1414. "[S]ubject only to rare exceptions, the local law of the state where the conduct and injury occurred will be applied to determine whether the actor satisfied minimum standards of acceptable conduct and whether the interest affected by the actor's conduct was entitled to legal protection." *Id.* at 1414 n. 11. Thus, this Court will apply California law to Maxim's tort claims.

> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

**11.** Section 156 reads:

### a. Misappropriation of trade secrets

■■■■ California has adopted the Uniform Trade Secret Act ("UTSA"). Under the UTSA, a court may enjoin actual or ***threatened*** misappropriation. CAL.CIVIL CODE § 3426.2. In the landmark case of *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262 (7th Cir.1995), the court applied this provision of the UTSA to create what is now considered the "inevitable disclosure" doctrine.[12]

Defendant William Redmond was a ten-year veteran sales employee of Pepsi. *Id.* at 1264. By 1994, he had become General Manager of Pepsi's California Business Unit, having revenues of more than $500 million and representing 20% of Pepsi's North American profits. *Id.* Because Redmond's position was relatively high up in Pepsi's hierarchy, Redmond had access to significant inside information and Pepsi trade secrets, including sales and marketing plans and "pricing architecture." *Id.*

In the spring of 1994, a former Pepsi executive who had become the head of Quaker's Gatorade division began to solicit Redmond. *Id.* Quaker eventually offered Redmond the position of "Vice President— On Premises Sales." *Id.* For some time, Redmond negotiated with Quaker over the salary of the position. *Id.* Eventually, Quaker offered Redmond the position of "Vice President—Field Operations." Throughout this time, Redmond kept his Quaker negotiations secret from Pepsi. *Id.*

On November 10, 1994, Redmond finally announced to his superiors that he was leaving Pepsi to go to its fierce competitor,

> Tortious Character of Conduct
> (1) The law selected by application of the rule of § 145 determines whether the actor's conduct was tortious.
> (2) The applicable law will usually be the local law of the state where the injury occurred.

**12.** CAL.CIV.CODE § 3426.2 and 765 ILL.COMP. STAT 1065/3(a) are identical.

Quaker.[13] Although Redmond had really only been offered the Gatorade "Vice President—Field Operations" position, Redmond told a number of Pepsi personnel that he was offered the chief operating officer position of the combined Quaker–Snapple company. *Id.* Apparently, Redmond hoped to further negotiate with Pepsi on salary. *Id.*

On November 16, 1994, Pepsi sought an injunction preventing Redmond from working for Quaker. The district court issued an injunction barring Redmond from assuming his new job through May of 1995 and permanently barred his use of Pepsi trade secrets. Redmond appealed the injunction, and the Seventh Circuit affirmed the district court.

In its decision, the court held that a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets. *Id.* at 1269. A number of factors in that case convinced the court that Redmond would inevitably rely on Pepsi's trade secrets. First, Pepsi had established beyond question that Redmond possessed extensive Pepsi trade secrets. Redmond had more than just general skills and knowledge. Instead, he had "particularized plans or processes developed by [Pepsi] and disclosed to him while the employer-employee relationship existed, which are unknown to others in the industry and which give the employer an advantage over his competitors" *Id.* These included Pepsi's annual Strategic Plan containing its competitive plans, financial goals, and three-year manufacturing, production, marketing, packaging and distribution strategies; its Annual Operating Plan, including its so-called "pricing archi-

tecture" for the coming year; its "attack plans" for specific markets; and its innovations in selling and delivery systems. *Id.* at 1265. Moreover, Redmond had signed a confidentiality agreement with Pepsi agreeing not to disclose confidential information relating to Pepsi's business not generally known or available to the public or recognized as standard practice. *Id.* at 1266.

Second, Redmond's responsibilities in his new position with Quaker were parallel to his old job so that he would have to refer to and use Pepsi's secrets. "[U]nless Redmond possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about Gatorade and Snapple by relying on his knowledge of [Pepsi's] trade secrets." [14] The court rejected defendants' arguments that Redmond's new agreement with Quaker required him to refrain from using Pepsi's trade secrets, and their claims that Pepsi's secrets would be completely useless to Redmond in any event as he executed his responsibilities to integrate the Gatorade and Snapple business lines. *Id.* at 1270. In this fiercely competitive field, "PepsiCo finds itself in the position of a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game." *Id.*

Third, Redmond's deceit played a part in the court's decision that he would inevitably disclose Pepsi's trade secrets. In this regard, the court relied on the district court's findings:

> Redmond's lack of forthrightness on some occasions, and out and out lies on others, in the period between the time he accepted the position with defendant Quaker and when he informed plaintiff

---

13. *Id.* at 1263–64. Quaker produces Gatorade, which is the dominant product in the market. *Id.* at 1264. Quaker had also recently obtained the popular Snapple beverage company and was merging its operations. *Id.* Pepsi had produced some products, but, its market share was only about half of that of Quaker. *Id.*

14. *Id.* at 1269. It is noteworthy that in support of this proposition, the court cited the Fifth Circuit's decision in *FMC Corp. v. Varco Int'l, Inc.* 677 F.2d 500, 504 (5th Cir.1982) ("Even assuming the best of good faith, Witt will have difficulty preventing his knowledge of FMC's 'Longsweep' manufacturing techniques from infiltrating his work.").

that he had accepted that position leads the court to conclude that defendant Redmond could not be trusted to act with the necessary sensitivity and good faith under the circumstances in which the only practical verification that he was not using plaintiff's secrets would be defendant Redmond's word to that effect.

*Id.* In other words, having shown himself to be untrustworthy in one context, the court doubted he would honor the non-disclosure obligation were he allowed to assume his new position. For these reasons, the district court's limited injunction, preventing Redmond from assuming his new position for six months, *i.e.*, until the Pepsi trade secrets he possessed were stale, was affirmed.

■ *Redmond* has been widely followed.[15] The only reported case that did not follow *Redmond* did so on a factual basis. *Bridgestone/Firestone, Inc. v. Lockhart,* 5 F.Supp.2d 667, 682 (S.D.Ind. 1998) ("Because misappropriation does not appear to be inevitable, or even seriously threatened, this case is different from *PepsiCo v. Redmond.*"). Although only a California Superior Court has had the opportunity to determine whether to follow *Redmond,*[16] this Court believes that the California Supreme Court would follow the overwhelming majority of other jurisdictions to do so. *See also* Johanna L. Edelstein, Note, *Intellectual Slavery?: The*

*Doctrine of Inevitable Disclosure of Trade Secrets,* 26 GOLDEN GATE U.L.REV. 717, 719 (Spring 1996) ("Because California has adopted the U.T.S.A. and because *PepsiCo* was a fact intensive analysis, this decision will affect California law.").

■ One commentator has delineated the factors that courts have relied upon in determining whether disclosure is inevitable. D. Peter Harvey, *"Inevitable" Trade Secret Misappropriation after PepsiCo, Inc. v. Redmond,* 537 PLI/PAT 199, 226 (1998). These factors include: (1) Is the new employer a competitor? (2) What is the scope of the defendant's new job? (3) Has the employee been less than candid about his new position? (4) Has plaintiff clearly identified the trade secrets which are at risk? (5) Has actual trade secret misappropriation already occurred? (6) Did the employee sign a non-disclosure and/or non-competition agreement? (7) Does the new employer have a policy against use of others' trade secrets? (8) Is it possible to "sanitize" the employee's new position? *Id.* at 226–27.

■ In the case *sub judice,* all of the factors espoused in *Redmond* and above weigh heavily in favor of a finding of inevitable disclosure. It is undisputed that Michelson was in possession of a great deal of Maxim's proprietary information and trade secrets. As in *Redmond,* Mi-

---

**15.** *See, e.g., Cardinal Freight Carriers, Inc. v. J.B. Hunt Transport Servs., Inc.,* 336 Ark. 143, 987 S.W.2d 642 (1999); *Conley v. DSC Communications Corp.,* NO. 05–98–01051–CV, 1999 WL 89955, *4 (Tex.App.—Dallas Feb 24, 1999, n.p.h.); *Novell Inc. v. Timpanogos Research Group Inc.,* NO. 970400339, 1998 WL 177721, 46 U.S.P.Q.2d 1197, 1216 (Utah Jan. 30, 1998); *Solutec Corp., Inc. v. Agnew,* NO. 16105–6–III, 1997 WL 794496, at *8 (Wash. App.Div. 3 Dec. 30, 1997), review denied, 136 Wash.2d 1004, 972 P.2d 464 (1998); *APAC Teleservices, Inc. v. McRae,* 985 F.Supp. 852, 857 n. 3 (N.D.Iowa 1997); *Southwestern Energy Co. v. Eickenhorst,* 955 F.Supp. 1078, 1085 (W.D.Ark.1997); *La Calhene, Inc. v. Spolyar,* 938 F.Supp. 523, 531 (W.D.Wis. 1996); *Lumex, Inc. v. Highsmith,* 919 F.Supp. 624, 633–34 (E.D.N.Y.1996); *Merck & Co.*

*Inc. v. Lyon,* 941 F.Supp. 1443, 1457 (M.D.N.C.1996); *Uncle B's Bakery, Inc. v. O'Rourke,* 920 F.Supp. 1405, 1435–36 (N.D.Iowa 1996).

**16.** In *Advanced Micro Devices v. Hyundai Electronics America,* the Superior Court of Santa Clara County relied upon the doctrine of inevitable discovery and granted a preliminary injunction forbidding five former engineers of Advanced Micro Devices Inc. from taking positions with a competitor, Hyundai Electronics America. Pascal W. DiFronzo, *A Little Knowledge Is a Dangerous Thing: The 'Inevitable Disclosure' Theory Is Gaining Prominence—but Does it Make Sense?,* IP: The Magazine for Law and High Technology <ht tp://www.ipmag.com/difronzo.html>.

chelson was a relatively high level manager who had a great deal of Maxim's confidential information and trade secrets in his possession. Michelson was directly involved in Maxim's pricing scheme and in its marketing strategy. Over a period of time, Michelson developed significant relationships with many of Maxim's clients. Michelson also signed a confidentiality agreement in which he agreed not to disclose confidential information relating to Maxim's business not generally known or available to the public. Like Redmond, Michelson left Maxim to go to his company's direct competitor.

Michelson's position at PHS is also sufficiently parallel to the position he held at Maxim. Although the vice-president of PHS tried to distinguish Michelson's position at PHS, there is no dispute that Michelson will inevitably be in direct competition with Maxim armed with Maxim's trade secrets. "[U]nless [Michelson] possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about [PHS] by relying on his knowledge of [Maxim's] trade secrets." *Redmond*, 54 F.3d at 1270. It is difficult not to conclude that PHS, entering the sterile tray assembly business, hired Michelson at a substantial raise in salary in order to utilize Maxim's trade secrets.

The Court also notes that PHS does not even have an agreement with PHS that would require him to refrain from using Maxim's trade secrets. Furthermore, Michelson's and PHS's vice-president's contentions that Maxim's secrets would be completely useless to Michelson as he executed his responsibilities were directly rejected by the *Redmond* court. *Id.* In this fiercely competitive field, the point is that Maxim "finds itself in the position of a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game." *Id.*

Michelson was also not candid regarding his new position, like Redmond, he negotiated for some time with PHS without telling Maxim. During these negotiations, Michelson divulged Maxim's confidential stock option agreement to PHS. Michelson also destroyed confidential information on his laptop hard drive and ordered a large batch of confidential client information printed the day before his departure. Michelson then lied to the staff member who printed the information by stating that the print out was off-line, thereby rendering it useless. Michelson, in an attempt to explain his suspicious actions, testified that these actions were a huge mistake and that he "will regret them for the rest of his life." The explanation was less than credible. Furthermore, his open hostility to Maxim and dissatisfaction with the company was palpable. There was also some evidence that Michelson might have backed up the deleted confidential information from his laptop hard drive. Michelson asserts that he did not do so, and that he threw away the printouts of the client information. In any event, his "lack of forthrightness on some occasions, and out and out lies on others, in the period between the time he accepted the position with [PHS] and when he informed plaintiff that he had accepted that position leads the court to conclude that defendant [Michelson] could not be trusted to act with the necessary sensitivity and good faith under the circumstances in which the only practical verification that he was not using plaintiff's secrets would be defendant [Michelson's] word to that effect." *Id.*

As a result, the Court concludes that, if Michelson has not already, he will inevitably disclose Maxim's trade secrets to PHS. Therefore, Maxim has a substantial likelihood of prevailing on the merits of its trade secret misappropriation claim.

### b. Breach of fiduciary duty and conversion claims

 Agents are considered to be fiduciaries of their principal. *See Duffy v. Cavalier*, 215 Cal.App.3d 1517, 1534, 264 Cal.Rptr. 740, 751 (1st Dist.1989) ("Any agent is also a fiduciary, whose obligation of diligent and faithful service is the same

as that of a trustee."). It is clear that through Michelson's actions, outlined *supra,* he put himself and his interests above that of his principal, thus, breaching his fiduciary duties. Accordingly, Maxim has a substantial likelihood of prevailing on the merits of its breach of fiduciary duty claim.

### c. Conversion claim

■ The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. *Moore v. Regents of Univ. of Cal.,* 51 Cal.3d 120, 144 & n. 38, 271 Cal. Rptr. 146, 793 P.2d 479 (1990); *Burlesci v. Petersen,* 68 Cal.App.4th 1062, 1065, 80 Cal.Rptr.2d 704, 706 (1st Dist.1998) (citing *Moore* ).

■ It is undisputed that Maxim owned the material on the hard drive of Michelson's laptop, as well as the computer printouts of the client information Michelson ordered. It is also undisputed that Michelson, at a minimum, destroyed this property. It is also without question, that Maxim has spent monies on recovering the information from the laptop hard drive. Therefore, there is a substantial likelihood that Maxim will prevail on the merits of its conversion claim.

### B. The rest of the preliminary injunction prerequisites

■ This Court has found that Maxim has a substantial likelihood of prevailing on its breach of the confidentiality agreement, misappropriation, breach of fiduciary duty, and conversion claims. Thus, the Court must next determine the remaining three prerequisites to obtaining injunctive relief, *i.e.,* (1) whether there is a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (2) whether the threatened injury outweighs any damage that the injunction might

cause the defendant; and (3) whether the injunction will not disserve the public interest. *Morales,* 164 F.3d at 224.

It is beyond dispute that Maxim will suffer irreparable harm if Michelson is permitted to work for PHS until the information he has becomes stale. As discussed *supra,* absent injunctive relief, Maxim will find itself in the big game competing against one of its own using its own playbook against it. Although Michelson will be without the PHS job until the information he has is stale, *i.e.,* one year,[17] by all accounts, he is a very talented salesman and manager. It is for this very reason that we are here today. Michelson's burden of finding another position is dwarfed by the impact on Maxim of Michelson competing with it. This injunction, which is to ensure that Michelson is not to benefit from his breach of contract, fiduciary duties, conversion, and misappropriation of trade secrets, is solely in the public's interest. If the Court did not enjoin such, Michelson would be permitted to benefit from his own wrongdoing. As a result, the Court determines that Maxim's application for preliminary injunction should be granted. Accordingly, the Court

**ORDERS** that Maxim's application for preliminary injunction is **GRANTED;** and further

**ORDERS** that Defendant Mark Michelson is enjoined for one year from his resignation date from working as or for a direct competitor of Maxim in any of the product lines he was associated with at Maxim during the last two years. Maxim is not required to post security. The trial date for this cause will issue by separate order.

---

17. At the hearing on this matter, Winslow, Maxim's representative and Michelson's supervisor, testified that the information Michelson possesses would not be stale for at least one year and perhaps even two years.