**BAYER CORPORATION, Plaintiff,**

v.

**ROCHE MOLECULAR SYSTEMS, INC., Defendant.**

**No. C99–01165 WHA.**

United States District Court, N.D. California.

Oct. 15, 1999.

---

C. Robert Boldt, Rick Richmond, and Brian McKeever, Kirkland & Ellis, Los Angeles, CA, for Bayer Corporation.

Charles B. Cohler, Kevin C. McCann, Lasky Haas & Cohler, San Francisco, CA, for Roche Molecular Systems, Inc.

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION BUT IMPOSING PERIODIC DISCOVERY TO MONITOR PROTECTION OF TRADE SECRETS; DENYING CROSS–MOTION TO STRIKE EXPERT DECLARATION; DENYING CROSS–MOTION TO DISMISS**

ALSUP, District Judge.

## INTRODUCTION

This motion for a preliminary injunction presents a conflict between two strong public policies of California—the policy favoring employee mobility free of encumbering restriction and the policy favoring protection of genuine trade secrets. On the present record, the Court concludes that employee mobility must prevail and denies plaintiff's motion to prohibit a former employee from pursuing his trade at a competitor. The theory of "inevitable disclosure" is not the law in California and, at trial, plaintiff will have to demonstrate actual use or disclosure, or actual threat thereof. For the purposes of a preliminary injunction, under California law, the theory of inevitable disclosure does not supply the proof needed to establish a probability of success on the merits nor does it suffice to raise serious questions about actual use or threat. In light of the substantial issues raised concerning actual use in this case and the ongoing risk of trade-secret disclosure, however, the court imposes certain periodic discovery obligations on the defendant and the employee. If this periodic and ongoing discovery reveals misuse of plaintiff's confidential or proprietary information, then plaintiff may renew its request preliminary injunctive relief.

## STATEMENT

Last February, Pete Betzelos quit his job as HIV Marketing Manager for the World–Wide Marketing Group at Bayer Corporation ("Bayer") to go to work for a competitor, Roche Molecular Systems, Inc.

("Roche"), as its International Marketing Manager, HIV. There is a clear overlap in job responsibilities.

Bayer and Roche both produce and market tests, called viral-load assays, that measure quantities of the Human Immunodeficiency Virus (HIV) in blood samples. Roche manufactures and distributes approximately 70% of the HIV viral-load assays sold throughout the world, and Bayer manufactures and distributes approximately 20 to 25% of the HIV viral-load assays sold throughout the world (Declaration of Dr. Gary T. Ford in Opposition to Bayer's Motion for Preliminary Injunction ("Ford Decl.") ¶ 14). Bayer's tests use bDNA technology. Roche's tests use PCR technology. They are completely different approaches to competing products. Bayer's products include its bDNA HIV 2.0 and 3.0 assays. Bayer's bDNA 3.0 assay is "ultra sensitive," meaning that it has a detection limit at or below 50 copies per milliliter of blood (Declaration of Michael Urdea, Ph.D. ("Urdea Decl.") at ¶¶ 10 & 11). Roche produces and markets a line of assay products under the name Amplicor HIV–1 Monitor (id. at ¶ 8). As part of this line Roche markets an "ultra sensitive" assay known as Amplicor HIV–1 Monitor Ultrasensitive method (id. at ¶ 11).

Before he left to work at Roche, Mr. Betzelos worked in Bayer's Nucleic Acid Diagnostics ("NAD") group, which Bayer had bought from Chiron Corporation ("Chiron") in late 1998. Bayer's NAD group focused on research, development, production and marketing of nucleic acid detection and quantification products or services for human medical practice (Dr. Urdea Decl. at ¶ 2). The NAD group manufactured and marketed human medical diagnostic assays (ibid.). The assays measured and provided other scientific details on a variety of viruses, including HIV (ibid.).

Mr. Betzelos' title at Bayer was both "HIV Products Manager" and then "HIV Marketing Manager" (Urdea Decl. at ¶ 6), but his responsibilities were the same under these two titles (ibid.). He was re-sponsible for the development and execution of marketing strategies, product launches, and marketing support activities (id. at ¶ 5). He was responsible for the overall success of Bayer's HIV products (id. at ¶ 5). He developed Bayer's worldwide marketing strategy for Bayer's HIV 3.0 assay (ibid.).

After Bayer acquired Chiron's NAD group in late 1998, a period of transition ensued for the NAD group employees (e.g. Eck Dep. 35:9–23). Mr. Betzelos started considering other employment options (Declaration of Pete Betzelos ("Betzelos Decl.") ¶ 5). In late December 1998, he learned of possible employment with an unidentified company as its International HIV Marketing Manager (ibid.). He responded to the inquiry, and learned that the company was Roche (ibid.). Roche hired Mr. Betzelos.

In a letter to the runner-up for Mr. Betzelos' new position at Roche, Pascal Mittermaier, Roche's Director of International Marketing, wrote:

> Filiberto, we have decided to select the other candidate for the job in Pleasanton. The only reason for choosing this person over yourself is the extensive U.S. HIV marketing experience he will bring to our business. I feel we really need someone with in-depth knowledge of this area to help us protect our HIV sales, particularly in our biggest market. He is currently the international HIV marketing manager for Chiron and has a unique understanding of the issues and people involved in HIV world-wide.

(Email from P. Mittermaier to F. de Cal dated Feb. 12, 1999).

Mr. Betzelos started working at Roche on March 8, 1999. Roche had advertised that its HIV International Marketing Manager would "develop and promote clear global marketing strategies for [Roche's] HIV product line" (Roche's Advertisement for International HIV Marketing Manager; Mittermaier Dep. at 110:25–112:22). In his new job, Mr. Betzelos ensures "correct positioning" of Roche's product lines

(Mittermaier Dep. at 119:7 to 120:16). Among the products that Mr. Betzelos markets for Roche are the Amplicor HIV–1 Monitor tests (Betzelos Dep. at 99:19 to 100:21). According to Roche, Mr. Betzelos is responsible only for marketing existing Amplicor HIV–1 viral-load assays, and not for launching new products (Ford Decl. at ¶ 17).[1]

According to Mr. Betzelos, when he began working for Roche, he signed a contract in which he agreed not to disclose or use confidential information (Betzelos Decl. at ¶ 20). On March 23, 1999, Mr. Betzelos signed a further undertaking for his employers at Roche in which he reaffirmed his agreement that he would not use or disclose any confidential or proprietary information of Chiron Diagnostics in his performance of his position as the International HIV Marketing Manager for Roche. The undertaking stated as follows:

> I have had an opportunity to read the order by United States District Court Judge Armstrong dated March 15, 1999. I realize the extent to which Judge Armstrong has relied on my representations that I will not use or disclose the trade secrets of Chiron Diagnostics in my employment with RMS. In addition, I have reviewed the business documents attached to Bayer's moving papers. Taking all of the foregoing into account, I now wish to reiterate and re-affirm my agreement that I will not use or disclose any confidential or proprietary information of Chiron Diagnostics in the performance of my position as the International Marketing Manager for HIV products for RMS.

(Memorandum from P. Betzelos to File dated Mar. 23, 1999).

### The Alleged Trade Secrets

Bayer alleges that Mr. Betzelos developed or knew of many Bayer trade secrets, including marketing strategies and confidential information about Bayer's products. Bayer lists the alleged trade secrets that it fears Mr. Betzelos will use in its supplemental interrogatory responses.

According to Dr. Urdea, Bayer took steps to maintain the secrecy of its confidential information (Urdea Decl. at ¶ 22). Bayer limited access to its computers and email through use of passwords and limited access to its offices (*ibid.*). Bayer used electronic keys to limit access to the floor where Mr. Betzelos worked (*ibid.*). Bayer notified employees that information at Bayer was confidential, and that it should be treated as such (*ibid.*). Bayer distributed confidentiality agreements for employees to review, sign and return (*ibid.*). In addition, Bayer generally limited the distribution of confidential information to senior management, and to others only on a need-to-know basis (*ibid.*). Bayer limited the distribution of strategic plans to which Mr. Betzelos had access (*ibid.*).

Bayer alleges that at least once a Roche employee has solicited confidential Bayer information from Mr. Betzelos. Bayer points to an email from Robert Degnan, Roche's National Sales Manager for PCR, to Mr. Betzelos regarding an account named ACT–G that Bayer and Roche were allegedly competing for. Mr. Degnan wrote "[d]o you have the Chiron pricing for ACT–G? We are in the process of negotiating with them" (Email from R. Degnan to P. Betzelos dated Apr. 30, 1999). Mr. Betzelos testified at deposition that he had not known the answer to Mr. Degnan's question and that he had not answered him (Betzelos Dep. at 191:1–6). Mr. Betzelos did not report the email, nor

---

1. In addition, Roche points to the following areas where Mr. Betzelos' responsibilities at Roche do not overlap with his former responsibilities at Bayer: full product life cycle marketing; participation with new product research and feasibility studies; defining product specifications and performance pa- rameters; financial analysis of return on investment, time to market, and net present value; new product prioritization; managing details of implementation of marketing campaigns; frequent contact with customers (Betzelos Decl. at ¶¶ 23–30).

did he tell Mr. Degnan that such a request was inappropriate (*id.* at 194:5–11).

Bayer claims that Mr. Betzelos has already used Bayer's trade secrets in three areas: reimbursement, automation, and specificity. Roche counters with evidence that the alleged trade secrets were generally known, that Roche already knew them, and/or that Roche did not use them. The details of these contentions are set forth in a separate order filed under seal to protect the details of the alleged trade secrets.

## Litigation History

In mid-February 1999, Dr. Urdea, the Senior Vice President of Bayer's NAD group, learned that Roche had hired Mr. Betzelos (Urdea Decl. at ¶ 23). Dr. Urdea directed Bayer's lawyers to contact Roche regarding possible accommodations Roche could make to avoid using Bayer's alleged trade secrets through Mr. Betzelos (*ibid.*). In response, Melinda Griffith, Roche's General Counsel, wrote in a letter dated March 4, 1999, that "RMS intends to proceed in good faith and we have every reason to believe that Mr. Betzelos will do so also." She also wrote:

[a]s you know, RMS is the market leader in developing nucleic acid diagnostic tests for infectious diseases; in fact RMS' PCR HIV and HCV tests have become the gold standard in the industry. Consequently, RMS has thorough knowledge of the marketplace, the customers and their needs, product positioning and the like, and we strongly believe that absolutely no information of Chiron Diagnostics would be advantageous to Mr. Betzelos' performance of his position with RMS.

Ms. Griffith pointed to California's "strong public policy in ensuring the freedom of employees to accept employment opportunities among competing companies." She concluded, "I hope this ends the matter."

Mr. Betzelos began work at Roche on March 8, 1999. He signed a contract in which he agreed not to disclose or use any trade secret of Chiron/Bayer during his employment with Roche (Betzelos Decl. at ¶ 21).

On that same day, C. Robert Boldt, counsel to Bayer, received a call from Ms. Griffith and Roche's outside counsel, Charles Cohler and Kevin McCann (Boldt Decl. at ¶ 5). Mr. Cohler told Mr. Boldt that he would investigate the facts, but that he saw no merit in Bayer's position regarding Mr. Betzelos (*ibid.*). Mr. Boldt asked whether Roche would be willing to sign an ˙ agreement protecting Bayer's trade secrets by limiting Mr. Betzelos' responsibilities; Mr. Cohler said that Roche would not sign such an agreement (*ibid.*). Mr. Boldt asked whether Roche would agree to a one-week period during which Roche would not use Mr. Betzelos in marketing competitive products; Mr. Cohler said Roche would not agree to such a proposal (*id.* at ¶ 6). Mr. Boldt asked Mr. Cohler and Ms. Griffith to describe Mr. Betzelos' job responsibilities at Roche (*id.* at ¶ 7). They did not, according to Bayer, answer his question (*ibid.*).

Four days later, on March 12, 1999, Bayer filed this suit and applied *ex parte* for a temporary restraining order ("TRO"). Bayer also requested expedited discovery. Judge Armstrong denied Bayer's application for a TRO, stating that "Bayer has provided the Court with virtually no information regarding the nature of Mr. Betzelos' new position with Roche" (Order, Armstrong, J., Mar. 15, 1999). Judge Armstrong also denied Bayer's request for expedited discovery (*ibid.*).

On March 18, 1999, Bayer noticed a motion for a preliminary injunction to be heard May 11, 1999, Judge Armstrong's next available calendar day. The next day Bayer applied *ex parte* to move the hearing date up to March 30, 1999. Bayer made this request because May 11 was "simply too late" (Bayer's Notice of *Ex Parte* Application). Bayer argued that by May 11, "the trade secrets that Bayer is trying to protect will have already been used to our detriment, and there will likely be little or nothing left to protect" (*ibid.*).

Bayer subsequently moved to withdraw this *ex parte* application.

On March 29, 1999, Bayer requested that Roche agree to meet and confer as soon as possible (Letter from R. Boldt to C. Cohler dated Mar. 29, 1999). On April 13, 1999, Bayer moved to withdraw its motion for a preliminary injunction. When the parties met on April 21, 1999, Bayer provided Roche with a comprehensive discovery plan (Letter from R. Boldt to C. Cohler dated Apr. 22, 1999). Bayer points to evidence that the parties pushed back the discovery plan because of the schedules of Roche's attorneys (Letter from R. Boldt to C. Cohler dated Apr. 23, 1999).

Roche initially refused to produce documents because it claimed that Bayer had not sufficiently identified its trade secrets (Letter from K. McCann to B. McKeever dated June 1, 1999). Bayer responded by supplementing its interrogatory responses on June 18, 1999. The supplemental responses included over twenty pages detailing confidential information that Bayer feared Mr. Betzelos would use in his job at Roche.

Bayer took Mr. Betzelos' deposition on July 8 and 9, 1999. In his deposition, Mr. Betzelos did not always readily provide answers to Bayer's questions. His deposition transcript is replete with objections and reveals the difficulty the examining attorney had in obtaining answers to questions. The deponent, for example, asked the examining attorney what the attorney meant by "customers," by "confidential," and by "compete" (Betzelos Dep. at 88:2—16, 89:1—24, 217:18—218:18).

Judge Armstrong held a case-management conference on July 16, 1999. She set October 5, 1999, as the date to hear Bayer's motion for a preliminary injunction.

Bayer filed its motion on August 3, 1999.[2] The case was reassigned to the undersigned judge on September 10, 1999 and the matter was heard on October 7, 1999.

## DISCUSSION

■ In order to prevail on its motion for a preliminary injunction, the moving party must demonstrate either (1) a likelihood of success on the merits and the possibility of irreparable injury or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor. *Metro Publishing, Ltd. v. San Jose Mercury News,* 987 F.2d 637 (9th Cir.1993). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 516 (9th Cir.1993) (quoting *Diamontiney v. Borg,* 918 F.2d 793, 795 (9th Cir.1990)). In other words, "[w]here a party can show a strong chance of success on the merits, he need only show a possibility of irreparable harm. Where, on the other hand, a party can show only that serious questions are raised, he must show that the balance of hardships tips sharply in his favor." *Id.* at 517.

### Success on the Merits

■ In a diversity case, a federal district court looks to the substantive law of the state to determine if a party seeking a preliminary injunction will likely succeed on the merits or if the party raises serious questions going to the merits. The Uniform Trade Secrets Act ("UTSA"), adopted by California in 1984, defines a trade secret as:

2. Roche counter-moved to dismiss this case as moot. Bayer, however, alleged and showed evidence that it still has trade secrets that may be misappropriated absent injunctive relief from this Court. The Court therefore DENIES the counter-motion to dismiss. Roche also counter-moved to strike the expert declaration of Dr. Randall J. Voorn, filed in support of Bayer's motion for a preliminary injunction. The Court does not rely on Dr. Voorn's declaration in deciding Bayer's motion; thus the Court does not reach whether Dr. Voorn's declaration is reliable under Federal Rule of Evidence 702. The Court therefore DENIES as moot Roche's counter-motion to strike Dr. Voorn's declaration.

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ.Code § 3426.1(d). The Court may enjoin "[a]ctual or threatened misappropriation" of a trade secret. Cal. Civ.Code § 3426.2(a). A corporation misappropriates a trade secret when (1) it discloses or uses the trade secret of another without express or implied consent, and (2) at the time of the disclosure or use, it knew or had reason to know that its knowledge of the trade secret was derived from a person who owed a duty to the entity seeking relief to maintain the trade secret's secrecy or limit its use. Cal. Civ.Code § 3426.1(b)(2)(B)(iii). The Court may order affirmative acts to protect a trade secret in appropriate circumstances. Cal. Civ.Code § 3426.2(c).

 The Court finds it likely that Bayer will prove all the elements of its trade-secrets case but one: actual or threatened use or disclosure. On that issue, Bayer raises factual circumstances of legitimate concern, but, in light of the overall record, which the Court has carefully read, Bayer has not carried its burden for obtaining preliminary relief. In brief, the Court finds that Bayer's specific evidence of actual use fails, either because the information was not really private or because it was already known by Roche. One item of contention (concerning automation) is a close question, but the evidence still tips in Roche's favor. Among other things, the counter-strategy allegedly advocated by Mr. Betzelos at Roche was already being promoted by Roche before his arrival. The Court also notes its reliance on Mr. Betzelos' undertaking, in which he affirmed that he would not use or disclose

Bayer's trade secrets. The fact specifics are discussed in the sealed order.

This brings us to Bayer's theory of inevitable disclosure. Invoking this concept, Bayer argues that the disclosure of its trade secrets is unavoidable because Mr. Betzelos inevitably will use them in his new position with Roche. Citing *PepsiCo v. Redmond*, 54 F.3d 1262 (7th Cir.1995), Bayer claims that a plaintiff may prove a claim of threatened misappropriation of a trade secret by demonstrating that a former employee's new employment will inevitably lead him to rely on plaintiff's trade secret.

In that case, PepsiCo sought a preliminary injunction against its former employee William Redmond and its competitor Quaker Oats Company to prevent him from working for Quaker. Because of his relatively high-level position at PepsiCo, Redmond had access to trade secrets and confidential information. PepsiCo alleged that Redmond's new position at Quaker posed a threat of misappropriation of PepsiCo's trade secrets. Applying Illinois trade-secrets law, the district court agreed and granted a six-month injunction against Redmond's employment with Quaker. The Seventh Circuit affirmed, finding (1) that Redmond possessed knowledge of specific PepsiCo trade secrets and not just "general skills and knowledge," (2) that armed with this knowledge and because his responsibilities at Quaker would parallel those at PepsiCo, Redmond would be able to anticipate PepsiCo's business moves, and (3) Redmond's "lack of forthrightness ... and out and out lies" demonstrated a "lack of candor ... and a willingness to misuse [PepsiCo's] trade secrets." *Id.* at 1269–70.

The Seventh Circuit noted, however, that

[t]he facts of the case do not ineluctably dictate the district court's conclusion. Redmond's ambiguous behavior toward his PepsiCo superiors might have been nothing more than an attempt to gain leverage in employment negotiations

.... Nonetheless, the district court, after listening to the witness, determined otherwise. That conclusion was not an abuse of discretion.

*Id.* at 1271. Although Redmond and Quaker argued that they did not intend to use any of PepsiCo's trade secrets and offered as proof an agreement signed by Redmond and Quaker to that effect, the district court rejected the argument. *Id.* at 1270.

The *PepsiCo* decision has given new life to the theory of inevitable disclosure. Previously, courts had recognized the theory, but were reluctant to apply it because of strong public policies in favor of employee mobility.[3] One commentator contends that 21 states (not including California) now allow plaintiffs to show liability for trade-secrets misappropriation under the theory.[4] The theory allows plaintiff employers to demonstrate threatened misappropriation without evidence of an employee's intent to disclose trade secrets.

"In finding a likelihood of disclosure, other courts that have applied the inevitable disclosure theory have considered the degree of competition between the former and new employer, and the new employer's efforts to safeguard the former's employer's trade secrets, and the former employee's 'lack of forthrightness both in his activities before accepting his job ... and in his testimony,' as well as the degree of similarity between the employee's former and current position." *Merck & Co., Inc. v. Lyon,* 941 F.Supp. 1443, 1460 (M.D.N.C. 1996) (holding that the inevitable disclosure theory can be applied under North Carolina law, where (1) injunction is limited to protecting specifically defined trade secrets and (2) the trade secret is clearly identified and of significant value) (internal citations omitted).

A decision from the Southern District of Texas has identified the following factors for determining whether a trade secret will be "inevitably disclosed":

(1) Is the new employer a competitor? (2) What is the scope of the defendant's new job? (3) Has the employee been less than candid about his new position? (4) Has plaintiff clearly identified the trade secrets which are at risk? (5) Has actual trade secret misappropriation already occurred? (6) Did the employee sign a nondisclosure and/or non-competition agreement? (7) Does the new employer have a policy against use of others' trade secrets? (8) Is it possible to 'sanitize' the employee's new position?

*Maxxim Medical v. Michelson,* 51 F.Supp.2d 773, 786 ( S.D.Tex.1999) (citing D. Peter Harvey, "Inevitable" Trade Secret Misappropriation after *PepsiCo, Inc. v. Redmond,* 537 PLI/PAT 199, 226 (1998)) *rev'd on other grounds* 182 F.3d 915 (5th Cir.1999). *Maxxim* stated "[a]lthough only a California Superior Court has had the opportunity to determine whether to follow *Redmond,* this Court believes that the California Supreme Court would follow the overwhelming majority of other jurisdictions to do so." *Maxxim Medical, Inc.,* 51 F.Supp.2d at 786. The *Maxxim* court relies on the finding of a California Superior Court to support its claim that the theory of inevitable disclosure is the law of California. California Superior Court decisions, however, are not citable authority.

Bayer also cites *Surgidev Corp. v. Eye Technology, Inc.,* 648 F.Supp. 661, 679–80 (D.Minn.1986) ("the trade-secrets laws of

**3.** In fact, the Seventh Circuit recognized this in its *PepsiCo* opinion. In an earlier case, *AMP Inc. v. Fleischhacker,* 823 F.2d 1199 (7th Cir.1987), the Seventh Circuit affirmed the denial of a preliminary injunction in a case alleging that a former employee would compromise trade secrets in his new position at a competitor. In that case, the Seventh Circuit emphasized that "the mere fact that a person assumed a similar position at a competitor does not, without more, make it 'inevitable that he will use or disclose ... trade secret information' so as to 'demonstrate irreparable harm.'" *PepsiCo,* 54 F.3d at 1269 (citing *AMP Inc. v. Fleischhacker*).

**4.** See Stephen L. Sheinfeld & Jennifer M. Chow, "Protecting Employer Secrets and the 'Doctrine of Inevitable Disclosure,'" 600 PLI/LIT 367 (1999).

California and Minnesota are substantially similar .... Because California and Minnesota laws are not in conflict, plaintiff's trade secret counts will be analyzed under both California and Minnesota law."). In that case, the plaintiff alleged that former employees misappropriated trade secrets when they went to work for the defendant competitor. Decided before *PepsiCo*, this *Surgidev* did not refer explicitly to a "theory" or "doctrine" of inevitable disclosure, but mentions the term as part of a theory of liability. According to the court, the fourth element of a trade-secrets cause of action "require[d] proof that there [was] an intention on the part of the defendants to use or disclose the putative trade secrets, or alternatively, ... there [was] a high degree of probability of inevitable disclosure." *Id.* at 695. But the outcome in *Surgidev* rested upon an affirmative showing of intent to use the trade secrets. "Here," the court held, "there is no need to rely on a presumption of wrongful intent, inasmuch as defendants have affirmatively demonstrated their intent to use some of plaintiff's customer information." *Ibid.* A striking dissimilarity between the law of the two states, moreover, is California's strong policy in favor of employee mobility.

More on point are two decisions from courts in California—decisions rejecting the theory of inevitable disclosure. *Danjaq LLC v. Sony Corp.*, 50 U.S.P.Q.2d 1638, 1999 WL 317629 (C.D.Cal. Mar.12, 1999), overlooked by both parties, involved an allegation of actual misappropriation of trade secrets relating to a "James Bond" motion picture.[5] There, the court stated in footnote one:

> [l]acking proof of actual disclosure and actual use, the Plaintiffs fill-in the gaps in the record with the 'inevitable disclosure doctrine' articulated in *PepsiCo v. Redmond*. But the Plaintiffs' reliance on the inevitable disclosure doctrine is misplaced. *PepsiCo is not the law of the State of California or the Ninth Circuit.*

*Id.* at 1640, 1999 WL 317629 (citation omitted) (emphasis added). *Danjaq* was followed in *Computer Sciences Corp. v. Computer Associates Int'l, Inc.*, 1999 WL 675446, *16 (C.D.Cal. Aug.12, 1999) (reiterating that inevitable disclosure doctrine "is not the law of the State of California or the Ninth Circuit").

In determining the law of California, the Court agrees with *Danjaq* and *Computer Sciences*. California public policy favors employee mobility and freedom. California Business and Professions Code Section 16600 provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Reading this language broadly, California courts generally do not enforce covenants not to compete. *E.g., Application Group v. Hunter Group*, 61 Cal.App.4th 881, 72 Cal. Rptr.2d 73 (1998). Nor do they generally enforce covenants that seek to avoid the policy by penalizing former employees who compete with their former employers. *See, e.g., Ware v. Merrill Lynch*, 24 Cal. App.3d 35, 100 Cal.Rptr. 791, 796–97 (1972) (invalidating under Section 16600 profit-sharing plan term that caused former employee to forgo benefits if employee competed with former employer). In the words of the California Supreme Court:

> Equity will to the fullest extent protect the property rights of employers in their trade secrets and otherwise, but public policy and natural justice require that equity should also be solicitous for the right inherent in all people, not fettered by negative covenants upon their part to the contrary, to follow any of the common occupations of life. Every individual possesses as a form of property, the right to pursue any calling, business or profession he may choose. A former employee has the right to engage in a competitive business for himself and to

---

5. The case was decided March 12, 1999, by Senior Judge Rafeedie of the U.S. District Court, Central District of California. It was reported at 50 U.S.P.Q.2d 1638. Bayer filed its motion for a preliminary injunction on August 3, 1999.

enter into competition with his former employer, even for the business of those who had formerly been the customers of his former employer, provided such competition is fairly and legally conducted. *Continental Car–Na–Var Corp. v. Moseley,* 24 Cal.2d 104, 110, 148 P.2d 9 (1944). To the extent that the theory of inevitable disclosure creates a de facto covenant not to compete without a nontrivial showing of actual or threatened use or disclosure, it is inconsistent with California policy and case law. *See* Ronald J. Gilson, *The Legal Infrastructure of High Technology Industrial Districts: Silicon Valley, Route 128, and Covenants Not to Compete,* 74 N.Y.U. L.Rev. 575, 623–24 (June 1999).

In sum, the Court holds that California trade-secrets law does not recognize the theory of inevitable disclosure; indeed, such a rule would run counter to the strong public policy in California favoring employee mobility. A trade-secrets plaintiff must show an actual use or an actual threat. Once a nontrivial violation is shown, however, a court may consider all of the factors considered by the jurisdictions allowing the theory in determining the possible extent of the irreparable injury. In other words, once the employee violates the trade-secrets law in a nontrivial way, the employee forfeits the benefit of the protective policy in California. For example, that a high-level employee takes a virtually identical job at the number one competitor in a fiercely competitive industry would be a factor militating in favor of a broader injunction once sufficient evidence of a nontrivial violation is shown. In the present case, however, sufficient evidence of such a nontrivial violation has not been shown.

### Balance of the Hardships

■ Where, as here, a moving party has shown only serious questions going to the merits, that party must also show that the balance of hardships tip sharply in its favor in order to prevail on its motion for a preliminary injunction. To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it. *See Los Angeles Memorial Coliseum Comm'n v. NFL,* 634 F.2d 1197, 1203 (9th Cir.1980). Here, Bayer and Roche both face hardship. Should the Court decline to enjoin Mr. Betzelos from working on Roche products that compete with Bayer products, and Roche subsequently uses Bayer's trade secrets, the value of those secrets will be lost to Bayer, and damages will not repair the loss. That hardship has, however, diminished with time, for the trade secrets have lost currency. If, on the other hand, the Court enjoins Mr. Betzelos from working on Roche's HIV Amplicor products, Roche would have to start over looking for a person to fill Mr. Betzelos' position. Not only would Roche face an immediate void, but his successor, when found, would need to spend time getting up to speed. Regarding whether Roche should be enjoined from continuing to employ Mr. Betzelos, the balance of hardships does not tip sharply in favor of Bayer. Nonetheless, the balance of the hardships certainly supports the minimum relief outlined below, namely an order (1) to Mr. Betzelos directing him to honor his undertaking to the Court (quoted earlier) not to use or disclose Bayer's confidential and/or proprietary information and (2) to Mr. Betzelos and Roche to stand for the periodic examinations in discovery imposed below.

### Discovery, Monitoring, and Possible Renewal of the Motion

■ Although Roche's counter evidence is strong enough to prevent a probability of success on the merits, Bayer has raised substantial questions about Mr. Betzelos' conduct. Although not compelling, a case has been made that he actually used his knowledge of Bayer's defensive strategy regarding automation to promote Roche's counter strategy on the same subject. Bayer demonstrates, too, a clear instance of a Roche employee trying to dig Chiron/Bayer proprietary information from Mr. Betzelos. And, Mr. Betzelos' evasive

manner at his deposition likewise causes serious concern.

The Court finds the record more than ample to support periodic and targeted discovery permitting counsel for Bayer to learn of Mr. Betzelos' communications and activities most likely to put Bayer's trade secrets at risk. Accordingly, the Court will impose ongoing discovery obligations on Roche and Mr. Betzelos. Should the discovery reveal evidence of use or disclosure of Bayer's confidential or proprietary information, Bayer may renew its motion for a preliminary injunction. The Court recognizes that Mr. Betzelos is not a formal party to this case. Roche, however, is. Roche must require Mr. Betzelos to comply with this order and to file a statement to this Court within ten days stating that Mr. Betzelos has agreed to comply with this order. Otherwise, the court will entertain an emergency application to add Mr. Betzelos as a party defendant.

## CONCLUSION

For the foregoing reasons, Bayer's motion for a preliminary injunction is DENIED. Roche's counter-motions to dismiss this case as moot and to strike Dr. Voorn's expert declaration are also DENIED. The Court, however, makes the following order:

1. Mr. Betzelos is ordered not to use or disclose any confidential or proprietary information of Chiron or Bayer.

2. In order to monitor compliance with this order, to permit plaintiff a fair and adequate opportunity for unobstructed discovery, and in light of the close factual issues raised by plaintiff, the Court orders the following:

 (a) Within ten days after this order, Mr. Betzelos shall appear for a deposition concerning his activities at Roche since his employment began, said deposition to last no more than one day.

 (b) Before the deposition, subject to the protective order, Roche will produce to Bayer's counsel all emails, calendars, phone messages, drafts, and other documents that constitute, summerize, describe, or refer to communications, meetings, or memoranda or reports to or from Mr. Betzelos referencing or relating directly to Bayer, Chiron, any of their HIV products, or to Roche's Amplicor HIV–1. The time period covered shall be from the date of his last deposition to September 30, 1999.

 (c) Within ten days after the end of the fourth quarter, Mr. Betzelos shall appear again for a deposition (not to exceed one day) at which he may be examined concerning possible misuse or disclosure of plaintiff's proprietary and/or confidential information during the fourth quarter. Counsel shall establish the date and place for such deposition no later than December 17, 1999. Roche shall update its document production required above as of the end of the fourth quarter in time for Bayer to use the updated production at Mr. Betzelos' January deposition. Roche shall put in place procedures to ensure timely production of all such evidence. With respect to the fourth quarter, Mr. Betzelos shall transcribe or otherwise preserve all voicemails that he receives on these subjects and they too must be produced.

 (d) At the depositions ordered herein, all objections as to form will be deemed preserved without counsel voicing those objections during the depositions. Counsel shall not make form objections and shall not interject "if you know" or the equivalent. Counsel may not confer with the witness during any line of questions, except for the limited purpose of determining any privilege issue. The full transcripts of the depositions shall be filed under seal for the Court's review.

3. If Mr. Betzelos receives any communications from any person seeking

confidential or proprietary information of Bayer or Chiron, then Mr. Betzelos shall, within 72 hours, communicate to the Court and to Bayer's counsel the substance of the communication and his response.

4. The parties are free to pursue discovery above and beyond the minimum monitoring discovery required by this order.

**IT IS SO ORDERED.**